UNITED STATES of America, Appellee,

v.

John DICKINSON, Appellant.

No. 537, Docket 82–1230.

United States Court of Appeals, Second Circuit.

Argued Nov. 23, 1982.

Decided April 21, 1983.

Michael H. Metzger, San Francisco, Cal. (Nina Wilder, Law Offices of Judd C. Iversen, P.C., San Francisco, Cal., of counsel), for appellant.

Peter A. Norling, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before PIERCE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

John Dickinson appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York after a four day jury trial before Judge Edward R. Neaher. Dickinson was found guilty of one count of wilfully failing to file a report of the transportation of currency outside the United States as part of a pattern of illegal activity, a felony under the enhancement provision of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 1059(2) (1976). He was also convicted on three counts of making false statements in a passport application, a violation of 18 U.S.C. § 1542 (1976). Dickinson appeals only the conviction under section 1059(2). Since we believe that conviction was based on an erroneous interpretation of section 1059(2), we reverse. However, Dickinson's conviction on the predicate misdemeanor offense of failure to file a report of the transportation of currency outside the United States, in violation of 31 U.S.C. § 1101 (1976), survives the reversal of his conviction on the felony charge and we therefore remand to the district court for entry of a judgment of conviction and resentencing.

## BACKGROUND

On August 29, 1980, Dickinson, traveling under the assumed name "John Root," arrived at Heathrow Airport in England. In the course of a routine customs check, British officials discovered that "Root" was carrying $860,000 in United States currency and had minute traces of marijuana in his possession. In response to questioning, Dickinson gave his home address as 625 Post Street, San Francisco. He told British officials that he worked for "Sumo Petroleum Products," a San Francisco oil company, and that he was traveling through the Middle East and on to Hong Kong in order to secure oil contracts. Dickinson indicated that he had carried substantial sums of currency on previous business trips with similar itineraries.

Since Dickinson had violated no British laws, the agents at Heathrow allowed him to continue on his way. However, British authorities contacted the United States Embassy in London and told them that "Root" was carrying a large amount of United States currency and might also possess marijuana. The embassy in turn relayed this information to customs agent Wayne Yamashita in San Francisco, whose investigation revealed that Sumo Petroleum Products did not exist and that 625 Post Street was a mail drop. As a consequence, Yamashita placed a "look-out" description of "Root" into the Treasury Enforcement Computer Systems (TECS).

On September 3, 1980, Dickinson, still traveling under the name "Root," arrived at San Francisco International Airport on a flight from Hong Kong. Customs agents intercepted him and a pat down search disclosed that he was carrying several thousand dollars in cash.

After several evasive answers to questions posed by the inspectors, Dickinson invoked his *Miranda* rights and asked to contact his attorney, Michael Metzger. A customs agent also spoke to Metzger, and arrangements were made for the attorney to meet with Dickinson outside the customs area. The agent allowed Dickinson to go to the meeting with Metzger alone. The same customs agent was later informed by Metzger that he had in fact met with Dickinson outside the customs area and, after a discussion, Dickinson had left Metzger saying he would return and resolve the customs matter. However, Dickinson never returned to the customs area. A search of his luggage after his disappearance revealed documents indicating transactions with Hong Kong and Canadian banks and with an investment company in Macao.

A warrant was issued for Dickinson's arrest in the name of "John David Root," but he remained a fugitive for over a year. In October, 1981, customs agent Donald Grattan spotted "Root" in East Hampton, New York and approached him. Dickinson gave the name "William Parker" and produced a Florida driver's license in that name. After a few other identification questions, Grattan placed Dickinson under arrest. Customs agents seized the rental car which Dickinson had been driving, along with a black bag and suitcase which were in the car. Dickinson was found to be carrying identification documents in the names of "John Root III," "William Parker," and "Phillip Gerard Lavasseur." The black bag contained birth certificates, a driver's license, and a passport in the name of "Rene Lionel Levesque." The suitcase contained $50,000 in cash.

Dickinson was charged with and convicted of three misdemeanor counts of making false statements in a passport application in violation of 18 U.S.C. § 1542. He does not appeal from those convictions. He was also charged with one felony count under 31 U.S.C. § 1059(2), the so-called enhancement provision of the Currency and Foreign Transactions Reporting Act (the Act). Violations of the Act are, without more, misdemeanors. *See, e.g.,* 31 U.S.C. § 1058 (1976). Section 1059, however, enhances some violations to felony status and provides that:

> Whoever wilfully violates any provision of this chapter where the violation is—
> (1) committed in furtherance of the commission of any other violation of Federal law, or
> (2) committed as part of a pattern of illegal activity involving transactions exceeding $100,000 in any twelve-month period, shall be fined not more than $500,000 or imprisoned not more than five years, or both.

The original felony complaint against Dickinson set forth what may be termed a multiple misdemeanor violation of section 1059(2); that is, the government offered to prove a violation of the enhancement provision through a pattern of violations of the Act. However, the indictment, the pretrial proceedings, and the government's opening statement all proceeded on a much more expansive theory. The prosecution's case amounted to: (i) a single violation of a reporting provision of the Act, 31 U.S.C. § 1101, involving the transportation of more than $100,000 in currency; (ii) multiple violations of federal passport laws in the use of false passports in the Hong Kong banking transactions, those transactions also involving sums in excess of $100,000; and (iii) a variety of highly suspicious documents and activities suggesting a laundering of money in excess of $100,000, possibly derived from criminal activities.

In support, the government offered the evidence of Dickinson's encounter with authorities in London's Heathrow Airport to show that Dickinson had transported $860,000 from the United States to another country without reporting that fact to customs authorities, a violation of 31 U.S.C. § 1101. It also showed transactions with the Nan Yang Bank in Hong Kong, made with the aid of false passports, violations of 18 U.S.C. § 1542. These transactions included two deposits, of $90,000 and $20,000 respectively, into an account held jointly in the names of John David Root and Marie Lacle, (Dickinson's companion), and a credit in the amount of $49,308 in another account. Other evidence included: (i) the cash carried by Dickinson in San Francisco and East Hampton; (ii) a promissory note to "Root" for $307,357 from the Nan Sun Investment Company in Macao; (iii) two deposits made to the account of "John Root" in the Bank of Nova Scotia for $115,530 and $100,000, both on August 5, 1980; (iv) a yellow "total sheet" seized from his luggage in San Francisco which was partially in Dickinson's handwriting and appeared to show the prices of a commodity listed by samples of various weights measured in kilograms; (v) a number of documents found on Dickinson's person, such as birth certificates and drivers' licenses which bore a variety of identities; (vi) Dickinson's itinerary between August 29 and September 3, 1980, which included travel stops in cities noted for narcotics activity and (vii)

the lack of any record of Dickinson's having filed federal income tax returns between 1978 and 1980.

## DISCUSSION

■ The Act establishes a scheme requiring various persons and financial institutions to keep records and to file reports concerning certain transactions, both domestic and foreign, involving the transfer of currency and monetary instruments. The violation of a specific provision of the Act or its concomitant regulations is a misdemeanor except in circumstances constituting a violation of section 1059, the enhancement provision quoted above. We are directed to only one other reported case involving a prosecution under section 1059(2), *United States v. Beusch*, 596 F.2d 871 (9th Cir.1979), which did not involve the same issue in the same context as is presented to us. The claims raised, therefore, are novel.

■ The government argues that the enhancement provision applies when it proves a single violation of the Act, at least one other illegal act, and a pattern of similar or related suspicious behavior, all of which involve more than an aggregate amount of $100,000. Dickinson contends, on the other hand, that the pattern of illegal activity must involve repeated violations of the Act itself, related to each other, and together involving more than $100,000. We believe the latter interpretation is correct, although we dispense with any pretense that the legislative history and other relevant criteria disclose a clearly marked trail.

While the language of section 1059(2) itself offers no conclusive answer, it is more supportive of Dickinson's interpretation than the view urged by the government. The words "a pattern of illegal activity" may refer either to related and repeated violations of the Act. If the statutory language were "a pattern of illegal activity involving in excess of $100,000," the government's case would be somewhat stronger. However, the modifying language, "*transactions* exceeding $100,000," (emphasis added) strongly suggests that multiple violations of the Act are required under section 1059(2).

The Act requires the keeping of records and the filing of reports relating to certain dealings in money. These dealings are defined by the statute or by regulations promulgated by the Secretary of the Treasury in terms of their surrounding circumstances and aggregate value, *e.g.,* 31 U.S.C. § 1058, 31 C.F.R. § 103.23 (1982). Throughout the statute each dealings are described as "transactions." Thus, the heading of Subchapter II is "DOMESTIC CURRENCY TRANSACTIONS," while Subchapter IV bears the label, "FOREIGN TRANSACTIONS." The Act itself is riddled with similar uses of that word, 31 U.S.C. §§ 1052(g), 1055, 1081, 1082, 1083(b), 1121, 1122, 1141, 1142 (1976).

Nowhere in the Act is the word "transactions" used to refer to events other than those covered by the Act itself. Thus, in the context of this use of "transactions" and the fact that section 1059(2) merely enhances the penalty for violations of the Act, we believe that the words "transactions exceeding $100,000" is most naturally construed as a reference to dealings in money which trigger one or more of the recordkeeping or reporting obligations of that Act. Since these words modify "a pattern of illegal activity," that phrase is then most naturally construed as a pattern of activity illegal *under the Act*. Read in combination, the two phrases thus mean related or connected violations of the Act involving monetary dealings to which the Act applies which in the aggregate involve more than $100,000.

While the legislative history is also not conclusive, it too supports the construction we give to the statute. Congress was largely concerned with the fact that the relative freedom accorded domestic and foreign currency transactions by American law in combination with the secrecy accorded currency transactions by certain foreign nations facilitated major criminal schemes, such as the laundering of money earned in criminal enterprises, the evasion of income taxes by gambling establishments, and the

perpetration of multinational securities frauds. In selecting among remedies, Congress rejected substantive restrictions on monetary or currency transactions but instead provided for a system of compulsory recordkeeping and reporting designed to diminish the advantages accorded such illegal activities by existing domestic and foreign law. *See generally Currency and Foreign Transactions Reporting Act: Hearings on H.R. 15073 Before the House Committee on Banking and Currency,* 91st Cong., 1st and 2d Sess. 11 (1970); *Currency and Foreign Transactions Reporting Act: Hearings on S.3678 and H.R. 15073 Before the Sub-Comm. on Financial Institutions of the Senate Committee on Banking and Currency,* 91st Cong., 2d Sess. 13 (1970); H.R.Rep. No. 975, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad.News 4394–4416.

Fashioning appropriate penalties for violation of the recordkeeping and recording requirements raised obvious difficulties. The integrity of the statutory scheme requires general compliance, yet the character of particular violations ranges from the merely undesirable to the criminally egregious. A tourist fearing delay if he or she reports currency being carried in or out of the country may commit an isolated violation. Major drug conspirators, on the other hand, may, with the aid of a willing financial institution, violate a variety of the Act's provisions in order to conceal and launder millions of dollars. In recognition of the widely varying character of potential violations, Congress established an escalating scheme of penalties. Individual violations of the Act, without more, are misdemeanors punishable by a maximum fine of $1,000 and prison term of one year. 31 U.S.C. § 1058. Knowingly false statements in a report required under the Act constitute a violation of 18 U.S.C. § 1001 (1976), punishable by a maximum fine of $10,000 and prison term of five years. 31 U.S.C. § 1052(k) (1976). Section 1059 provides for the severely enhanced penalties of a maximum fine of $500,000 and prison term of five years in two circumstances. First, section 1059(1) provides for enhancement where a violation of the Act is committed in furtherance of any other violation of federal law. Second, section 1059(2), the provision in question here, enhances the penalty for a violation of the Act "committed as part of a pattern of illegal activity involving transactions exceeding $100,000...." The House Report gave the following reasons for adopting section 1059(2):

> It should be noted that serious violations under this title may involve very large sums of money, and fines of as much as $10,000 or more might be shrugged off as a mere cost of doing business. To have any real deterrent effect, the potential fine must be large enough to have some real economic impact on potential violators.

H.R.Rep. No. 975, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Ad.News 4394, 4406.

This statement strongly supports the view of the statute we take here. The acts which call for enhancement are not violations of other laws, state or federal, or suspicious acts involving currency, but "serious violations under this title." Congress was concerned with the fact that the lesser penalties simply would not deter persons systematically laundering or concealing very large sums of money emanating from ongoing criminal activities. The calculus of risk facing a potential violator is substantially altered by the magnitude of the sums involved in the illegal transactions and the evidence before Congress indicated that many of the persons seeking to take advantage of the unfortunate mix of domestic and foreign law were dealing in large sums indeed. In order to deter such potential violators, therefore, Congress severely enhanced the penalty for a pattern of violations of the Act involving more than $100,000 in a calendar year. The requirement that the violations be part of a pattern merely excludes cases where the violations are isolated events and not part of a common or systematic scheme.

Although we find that the government's evidence was insufficient to sustain a conviction under the enhancement provi-

sion of section 1059(2), we note that the jury was properly charged by Judge Neaher that it must first conclude that Dickinson was guilty of the lesser predicate offense of wilfully failing to file a report of the transportation of more than $5,000 in currency outside the United States in violation of 31 U.S.C. § 1101. That offense, as charged in count 1 of the indictment, rested upon the wilful transportation out of the country of $860,000 in currency without reporting it. This was more than amply established at trial by the testimony of British customs officers and Dickinson's concealment of his identity, employment and address while traveling with that currency from New York to London. Thus, we find that although Dickinson's conviction on the felony count fails, his conviction for the predicate misdemeanor violation of section 1101 survives. We do this under the long accepted rule which grants a reviewing court authority to enter judgment on a lesser included offense when it finds that those elements exclusive to the greater—or in this case, enhanced offense—are not supported by sufficient evidence to sustain the jury's verdict, but that there is sufficient evidence to sustain a finding of guilt on all elements of the lesser offense. *See, e.g., Virgin Islands v. Josiah,* 641 F.2d 1103, 1108–09 (3d Cir. 1981); *United States v. Swiderski,* 548 F.2d 445, 452 (2d Cir.1977).

In the course of this appeal, Dickinson raises a number of questions regarding police and customs procedures, evidentiary admissions at trial, and the district court's charge to the jury. We decline to reach those claims which relate only to elements exclusive to the felony count charged under section 1059(2) and to his unappealed convictions for the use of a false passport. Moreover, Dickinson's arguments regarding the legality of the conduct of the customs agents during his detention and interrogation at San Francisco International Airport either do not bear on his surviving misdemeanor conviction or are plainly harmless beyond a reasonable doubt. We therefore find it unnecessary to reach them.