UNITED STATES of America,
Plaintiff, Appellee,

v.

BANK OF NEW ENGLAND, N.A.,
Defendant, Appellant.

No. 86–1334.

United States Court of Appeals,
First Circuit.

Argued March 4, 1987.

Decided June 10, 1987.

See also, D.C., 640 F.Supp. 36.

Laurence H. Tribe with whom Susan Est-rich, Cambridge, Mass., Kathleen M. Sulli-van, Laurence, Mass., Mark A. Michelson, Amos Hugh Scott, and Choate, Hall & Stewart, Boston, Mass., were on brief, for defendant, appellant.

Sara Criscitelli, Dept. of Justice, Wash-ington, D.C., with whom Robert S. Mueller, III, U.S. Atty. and John J.E. Markham, II, Asst. U.S. Atty., Boston, Mass., for the D. of Mass., were on brief, for plaintiff, appel-lee.

Before BOWNES and SELYA, Circuit Judges, and PETTINE,* Senior District Judge.

BOWNES, Circuit Judge.

The Bank of New England appeals a jury verdict convicting it of thirty-one violations of the Currency Transaction Reporting Act

* Of the District of Rhode Island, sitting by desig-nation.

(the Act).[1] 31 U.S.C. §§ 5311–22 (1982).[2] Department of Treasury regulations promulgated under the Act require banks to file Currency Transaction Reports (CTRs) within fifteen days of customer currency transactions exceeding $10,000. 31 C.F.R. § 103.22 (1986).[3] The Act imposes felony liability when a bank willfully fails to file such reports "as part of a pattern of illegal activity involving transactions of more than $100,000 in a twelve-month period...." 31 U.S.C. § 5322(b).

## I. THE ISSUES

The Bank was found guilty of having failed to file CTRs on cash withdrawals made by James McDonough. It is undisputed that on thirty-one separate occasions between May 1983 and July 1984, McDonough withdrew from the Prudential Branch of the Bank more than $10,000 in cash by using multiple checks—each one individually under $10,000—presented simultaneously to a single bank teller. The Bank contends that such conduct did not trigger the Act's reporting requirements. It also urges that felony liability should not have been imposed because it did not engage in a pattern of illegal activity. In addition, the Bank avers that, if it did commit a felony violation, it did not commit thirty-one of them. The Bank also argues that

the trial judge's instructions on willfulness were fatally flawed, and that, in any event, the evidence did not suffice to show that it willfully failed to file CTRs on McDonough's transactions. Finally, the Bank submits that during her charge to the jury, the trial judge erroneously alluded to evidence of the Bank's conduct after the dates specified in the indictment.

The Bank had been named in a federal grand jury indictment which was returned on October 15, 1985. Count One of the indictment alleged that between May 1983 and May 1985, James McDonough, the Bank, and Carol Orlandella and Patricia Murphy—both of whom were former head tellers with the Bank's Prudential Branch—unlawfully conspired to conceal from the IRS thirty-six of McDonough's currency transactions. The trial court directed a verdict of acquittal on this count. Defendants Murphy and Orlandella were found not guilty of charges that they individually aided and abetted the failure to file CTRs on McDonough's transactions.

The bulk of the indictment alleged that the Bank, as principal, and McDonough, as an aider and abettor, willfully failed to file CTRs on thirty-six occasions between May 1983 and July 1984. Five counts were dismissed because, on those occasions, McDonough received cashier's checks from

1. The Act is also referred to as the Bank Secrecy Act.

2. The Act provides in relevant part:
 **§ 5313. Reports on domestic coins and currency transactions**
 (a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.
 **§ 5322. Criminal penalties**
 (a) A person willfully violating this subchapter or a regulation prescribed under this

 subchapter (except section 5315 of this title or a regulation prescribed under section 5315) shall be fined not more than $1,000, imprisoned for not more than one year, or both.
 (b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), while violating another law of the United States or as part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period, shall be fined no more than $500,000, imprisoned for not more than 5 years, or both.

3. The regulations then in effect provided:
 **§ 103.22 Reports of currency transactions**
 (a)(1) Each financial institution, other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000.

the Bank, rather than currency. McDonough was acquitted of all charges against him. The Bank was found guilty on the thirty-one remaining counts. We affirm.

## II. THE REPORTABILITY OF McDONOUGH'S TRANSACTIONS

The evidence at trial revealed that from 1978 through September 1984, McDonough was a regular customer at the Prudential Branch of the Bank of New England. McDonough visited that branch several times a month to withdraw large sums of cash from various corporate accounts. On thirty-one occasions from May 1983 through July 1984, McDonough requested a number of counter checks—blank checks which a teller encodes with the customer's account number—which he would then make payable to cash for sums varying between $5,000 and $9,000. On each of the charged occasions, McDonough simultaneously presented to a teller between two and four counter checks, none of which individually amounted to $10,000. Each check was recorded separately as an "item" on the Bank's settlement sheets. Once the checks were processed, McDonough would receive in a single transfer from the teller, one lump sum of cash which always amounted to over $10,000. On each of the charged occasions, the cash was withdrawn from one account. The Bank did not file CTRs on any of these transactions until May 1985, shortly after it received a grand jury subpoena.

The Bank contends that its conviction must be overturned because it did not engage in conduct that can be construed as violative of the Currency Transaction Reporting Act. It argues that the Act and its implementing regulations do not provide fair warning that a violation occurs if a financial institution fails to report a cash withdrawal in excess of $10,000 effected by a customer's use of multiple checks, each of which is less than $10,000. The Bank submits that since the Act fails to give sufficient notice that such conduct triggers the reporting requirements, its conviction violates fundamental norms of due process. It points out that the Constitution forbids the conviction of a defendant for conduct not clearly proscribed by penal statutes. *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939); *United States v. Anzalone*, 766 F.2d 676 (1st Cir.1985). The Bank asserts that to convict it for conduct not expressly prohibited by the Currency Transaction Reporting Act offends the basic constitutional canon that "the power of punishment is vested in the legislative, not in the judicial[,] department." *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965) (quoting *United States v. Wiltberger*, 5 U.S. (5 Wheat.) 76, 5 L.Ed. 37 (1820)).

The Currency Transaction Reporting Act instructs the Treasury Department to promulgate regulations specifying the circumstances and currency amounts which trigger the Act's reporting requirements. 31 U.S.C. § 5313 (1982). The Treasury regulations, promulgated in 1972, provide: "Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer ... to such financial institution, which involves a transaction in currency of more than $10,000." 31 C.F.R. § 103.22 (1986). The question is whether the due process requirement of fair warning forbids us from reading this regulation as imposing a duty on banks to file reports on customers who withdraw more than $10,000 in cash at one time by using two to four checks instead of only one check.

The Treasury regulations define "transaction in currency" to mean a "transaction involving the physical transfer of currency from one person to another." 31 C.F.R. § 103.11 (1986). In the instant case, McDonough's practice was to visit the same branch of the same bank on only one occasion in a single day. He simultaneously would present to a single bank teller two to four checks, all made payable to cash, for varying amounts under $10,000 which, when added together, equalled a sum greater than $10,000. In return, the same bank teller would transfer to him in a sin-

gle motion a wad of cash totalling more than $10,000.

We have no trouble categorizing such conduct as a single physical transfer of currency in excess of $10,000 from the Bank to McDonough. We, therefore, conclude that the language of the regulations itself gave the Bank fair warning that McDonough's transactions were reportable. This case does not, as the Bank suggests, involve a bank customer engaging in multiple currency transactions. McDonough engaged in thirty-one separate transactions, each exceeding $10,000, which were effected by the use of multiple checks. The use of multiple checks during a single transfer of currency is not the same as multiple currency transactions. Thus, the Bank's citation to comments from agency officials, such as the IRS Assistant Commissioner for Criminal Investigation, about the reportability of multiple transactions is irrelevant. These comments have no bearing on the resolution of this case, but, instead, are addressed to situations in which a customer obtains over $10,000 via more than one physical transfer of currency.[4] E.g., United States v. Reinis, 794 F.2d 506 (9th Cir. 1986) (cash withdrawal exceeding $10,000 effected by defendant's and his agents' purchase of several cashier's checks from the same bank in a single day but at different times, held not reportable since there was no single transfer of currency exceeding $10,000 to either defendant personally or any one of his agents); United States v. Dela Espriella, 781 F.2d 1432 (9th Cir. 1986) (defendant who obtained more than $100,000 currency a day by sending several agents to 19 different bank locations to purchase cashier's checks for less than $10,000 each did not engage in a reportable transaction); United States v. Varbel, 780 F.2d 758 (9th Cir.1986) (no CTRs required to be filed on defendant who obtained $50,-000 in three days by purchasing six cashier's checks, each under $10,000, from six different banks); United States v. Denemark, 779 F.2d 1559 (11th Cir.1986) (CTR need not be filed on defendant who purchased 14 checks for approximately $9,900 each from 14 different financial institutions); United States v. Cogswell, 637 F.Supp. 295 (N.D.Cal.1985) (no CTR required to be filed on defendant who purchased three different cashier's checks each slightly less than $10,000 at three different banks in a single day). Indeed, the IRS Assistant Commissioner for Criminal Investigation specifically discussed Varbel, Denemark, and Cogswell immediately after stating that the Treasury regulations do not require "that multiple currency transactions on the same day (each less than $10,000) that aggregate more than $10,000, be reported by a financial institution." Tax Evasion, Drug Trafficking and Money Laundering as They Involve Financial Institutions: Hearings Before The Subcomm. on Financial Institutions Supervision, Regulation and Insurance of the House Comm. on Banking, Finance and Urban Affairs, 99th Cong., 2d Sess. 181 (1986).

The instant case does not involve a defendant employing several agents to purchase a number of checks, each under $10,-000, from the same bank in a single day. Nor does it involve a single defendant visiting different banks on the same day; or different branches of the same bank on the same or different days; or even different visits to the same branch of the same bank on the same day. The fact that such practices may be regarded as multiple transactions, and their reportability under the act may be uncertain, is of no moment here. It is undisputed that each of the violations charged in the indictment involved a single, lump-sum transfer of more than $10,000 to McDonough from the Bank's Prudential

---

4. For example, the Bank cites the following statement from the Comptroller General:

The regulations were silent on the propriety of a customer's conducting multiple transactions to avoid reporting....

....

... Similarly, although the regulations required reporting for each single transaction above $10,000, they did not specifically prohibit dividing a large transaction into several smaller transactions to circumvent the reporting requirement.

Comptroller General, Report to Congress, Bank Secrecy Reporting Requirements Have Not Yet Met Expectations, Suggesting Need for Amendment, GGD–81–80, at 23–24 (1981)

Branch. McDonough's method of withdrawing more than $10,000 in cash can be regarded as multiple transactions only by disregarding the fact that he would make but one visit in a day to the same branch of the same bank where he would simultaneously present more than one check to one teller who would hand him in one motion a single sum of cash exceeding $10,000. McDonough could be said to have engaged in multiple transactions only by reading the regulations as attaching paramount importance to the number of checks presented by a customer. The regulations, however, impart primary significance to the amount of currency transferred, defining transaction as "the physical transfer of currency from one person to another." 31 C.F.R. § 103.11. On every occasion for which it was found guilty, the Bank transferred more than $10,000 to McDonough in a single act.

This case falls squarely within the Act's reporting requirements because it involves the physical transfer of more than $10,000 in currency from one bank in one day to a single customer during a single visit. A survey of the case law indicates that when a customer uses several checks, each of which is less than $10,000, in order to withdraw more than $10,000 from the same bank on the same day, he has engaged in a reportable transaction. *See United States v. Cure,* 804 F.2d 625, 629 (11th Cir.1986) ("purchase of multiple cashier's checks in an aggregate amount of more than $10,000 from different branches of the same bank on the same day constitutes a single transaction in excess of $10,000"); *United States v. Heyman,* 794 F.2d 788, 792 (2d Cir.) (financial institution must report a customer deposit exceeding $10,000 which had been divided into small sums and in a single day deposited into different accounts held by the same customer in the same financial institution), *cert. denied,* —— U.S.

——, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Giancola,* 783 F.2d 1549 (11th Cir.) (bank must file CTRs on defendants who purchased over $10,000 in cashier's checks in a single day by structuring transactions in amounts of less than $10,000 at different branches of the same bank), *cert. denied,* —— U.S. ——, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); *United States v. Tobon-Builes,* 706 F.2d 1092 (11th Cir. 1983) (defendant's conduct, whereby on ten occasions he entered bank and each time simultaneously purchased two cashier's checks for $9,000, "clearly came within the ambit of the financial institution reporting requirements"); *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979) (bank employee who divided $45,000 loan into five $9,000 notes and then simultaneously handed five bundles of $9,000 cash to borrower, properly convicted of failing to file a CTR on a $45,000 transaction).

As some of the cases cited hold, the reporting requirements may attach, even if a customer obtains $10,000 or more by visiting different branches of the same bank at various times in a single day. This is not the situation here; McDonough always obtained more than $10,000 cash by making one visit on a given day to the same branch of the same bank. We need not decide whether the current regulations can be read to impose a reporting obligation when a customer receives more than $10,000 currency by making numerous visits on the same day to different branches of the same bank. The Treasury Department, at the urging of other branches of government, recently has amended the current regulations so that they expressly obligate financial institutions to treat as a single reportable transaction, multiple currency transactions by a customer which total more than $10,000 in a single day.[5] This amendment is irrelevant to the matter

5. The amendment reads as follows:
 **§ 103.22 Reports of currency transactions.**
 (a)(1) Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment, or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000.

 Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day....
52 Fed.Reg. 11436 (April 8, 1987).

before us, since McDonough did not engage in multiple currency transactions.

The Bank relies heavily on our decision in *United States v. Anzalone*, 766 F.2d 676 (1st Cir.1985). In that case, we overturned a bank customer's conviction for violations of the Act. The defendant in *Anzalone* had purchased three checks on November 13, 1980, from the Haymarket Cooperative Bank. Each of the checks was less than $10,000, but in the aggregate they amounted to $25,000. Thereafter, the defendant purchased nine different checks on nine separate days, totalling $75,000. None of the checks individually, however, exceeded $10,000. We held that nothing in either the Act or its regulations obligated a bank *customer* to report cash withdrawals of $10,000 or more. 766 F.2d at 681–82. Anzalone also had been convicted of willfully aiding and abetting the Haymarket Bank's failure to file a CTR. We reversed that conviction, holding that "[t]he Bank, under the circumstances of this case, did not commit any crime by failing to report transactions as it lacked knowledge of their 'structured' nature." 766 F.2d at 683.

*Anzalone* held that the Treasury Regulations then in effect imposed no duty on a customer to inform a financial institution that he or she is structuring transactions to avoid the Act's reporting requirements. The case also held that the Haymarket Bank did not have to report transactions that it did not know were being structured to avoid the Act's reporting requirements. Judge Aldrich concurred with this holding, but wrote separately to emphasize his view that the bank did have a duty to report the November 13, 1980, withdrawal in which Anzalone acquired three $8,500 checks from three separate tellers at two different branches of the Haymarket Bank. The government, however, chose to lump Anzalone's conduct on November 13 with his actions on the nine separate days thereafter, when he purchased nine different checks, totalling $75,000, each of which was slightly less than $10,000. Thus, the government's presentation of the case rendered it unnecessary for the court to decide whether Anzalone's November 13 transaction was reportable. Judge Aldrich, there-fore, had no reason to diverge from the court's main holding. 766 F.2d at 683–84.

*Anzalone* involved the reportability of two kinds of transactions. First, it held that the Act does not require a bank to report multiple transactions undertaken on different days which aggregate to more than $10,000, *if* the bank does not know the transactions are being structured to avoid the Act's reporting requirements. 766 F.2d at 683. Second, *Anzalone* did *not* decide whether a customer engages in a reportable transaction when he obtains more than $10,000 by receiving a total of three transfers of currency from two branches of the same bank in a single day. *Anzalone* thus does not foreclose a holding that both these kind of transactions are reportable. But more importantly, the facts of the instant case are wholly distinguishable from either of these two situations. *Anzalone*, therefore, has no direct bearing on the issues before us.

On thirty-one occasions, James McDonough visited the same branch of the same bank at one time in a single day. He presented between two and four checks totalling more than $10,000 to one bank teller and received from the teller a single sum of cash in excess of $10,000. Since the regulations define transaction in currency to mean "the physical transfer of currency from one person to another," we hold that the Bank had adequate warning that a single, lump-sum transfer of cash exceeding $10,000 was reportable, regardless of the number of checks the customer uses to obtain the money.

## III. THE IMPOSITION OF FELONY LIABILITY ON THE BANK

### A. The "Pattern" Instruction

■ 31 U.S.C. § 5322(b) provides in pertinent part:

(b) A person willfully violating this subchapter or a regulation prescribed under this subchapter (except section 5315 of this title or a regulation prescribed under section 5315), ... as part of a pattern of illegal activity involving trans-

actions of more than $100,000 in a 12–month period shall be fined....

The Bank claims that the jury was erroneously instructed on the definition of "a pattern of illegal activity" and that, therefore, a new trial is necessary. Before we examine the pattern instruction, we note that the Bank did not, despite the provisions of Federal Rule of Criminal Procedure 30, object to the instructed definition. This means that the instruction must stand unless it constituted plain error. *United States v. Krowen,* 809 F.2d 144, 150 (1st Cir.1987); *United States v. Kakley,* 741 F.2d 1, 3 (1st Cir.), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984). Nor did the Bank submit a suggested definition of pattern in its requests for instructions.

The district court's instruction was:

Pattern simply means repeated transactions. One transaction is not a pattern; two may not be either, but if you get a series of transactions, that may then be a pattern. And in this context, what we're talking about is a pattern of repeated failures to file required reports on these transactions.

The Government must prove that the transactions involved more than $100,000 in a 12–month period. No one transaction has to be greater than $100,000, so long as the total of the transactions is in any 12–month period. It's a shifting period, so you can look at any period that you want. And if within that period, transactions of more than $100,000 occurred and there was a willful failure to file with respect to them, then this fourth element has been satisfied.

So, if you find that a series of transactions occurred that required the filing of reports and that the total of such transactions in any 12–month period involved more than $100,000, this element is satisfied, even if no one transaction itself exceeded 100,000 dollars. It is kind of a fillip on the multiple business. So, if you find that a reportable transaction occurred, that no report was filed, that transaction may be considered as part of the pattern if others occurred and if in any 12–month period the total was more than $100,000.

■ The Bank attacks the instruction on two grounds: that the definition of pattern is impermissibly broad; and the court failed to distinguish between a pattern of conduct by the defendant McDonough and a pattern of activity by the Bank. We reject both contentions.

There are three cases construing "a pattern of illegal activity" under the Act. In *United States v. Dickinson,* 706 F.2d 88 (2d Cir.1983), the court appeared to adopt the following definition: "the pattern of illegal activity *must involve repeated violations* of the Act itself, related to each other and together involving more than $100,000." *Id.* at 91 (emphasis added). The court stated later: "The requirement that the violations be part of a pattern merely excludes cases where the violations are isolated events and not part of a common or systematic scheme." *Id.* at 92.

The Ninth Circuit in *United States v. Beusch,* 596 F.2d 871 (9th Cir.1979), discussed the meaning of pattern under 31 U.S.C. § 1059, the predecessor statute to § 5322(b):

First, the plain language of subsection (2) of § 1059 indicates to us that a series of currency transfers which, by themselves, constitute only misdemeanors, may also constitute felonious activity if they (a) show a pattern of illegal activity, and (b) exceed $100,000 over a 12–month period. In contrast to subsection (1) of § 1059, which requires other illegal activity (i.e., activity not involving violations of the Bank Secrecy Act), subsection (2) evidences no similar requirements. *We infer, therefore, that a series of misdemeanor violations of the act may, by themselves, call forth the increased penalties of subsection (2).*

*Id.* at 878 (emphasis added).

The most recent case we could find on the subject is *United States v. Valdes-Guerra,* 758 F.2d 1411 (11th Cir.1985). The court stated:

While there is little caselaw construing the phrase "pattern of illegal activity," both circuits which have directly con-

fronted the issue have held that *a series of currency reporting violations* which, by themselves, constitute only misdemeanors may also be felonious if they show a pattern of illegal activity and exceed $100,000.00 over a twelve-month period. *United States v. Dickinson,* 706 F.2d 88, 91–93 (2d Cir.1983); *United States v. Beusch,* 596 F.2d 871, 878–79 (9th Cir.1979). We agree with those courts that the legislative history of section 5322(b) evinces an intent not only to deal seriously with reporting violations undertaken in conjunction with violations of other federal laws, *but also to punish as a felony violations undertaken in a repeated manner which "involve very large sums of money."* H.R.Rep. No. 91–975, 91st Cong., 2d Sess. (1970), 1970 U.S. Code Cong. & Ad.News 4394, 4406. Congress intended that "serious violations *under this title"* could not "be shrugged off as a mere cost of doing business." *Id.* (emphasis added); *Dickinson,* 706 F.2d at 92.

*Id.* at 1414 (emphasis added).

■ The common theme running through these three cases is that a pattern consists of repeated violations or a series of violations. The court's instruction clearly embodied this. While the instruction might have been more accurate if it defined pattern as repeated *and* related violations of the Act, the omission of the word related does not even come close to plain error. Under the evidence adduced, it was clear that the repeated failures by the Bank to report were directly related to the withdrawals by McDonough. These failures were not isolated events; they entailed repeated failures to file CTRs on similar transactions by the same customer. The similarity of the transactions, coupled with the frequency and regularity of their repetition, establish a related scheme.

■ The contention that the instruction did not distinguish between a pattern by McDonough and another by the Bank is technically correct, but it ignores the rest of the charge in which the court repeatedly informed the jury that each defendant must be judged separately. The court also pointed out that it was the Bank that had the duty to report the transactions. To argue that the Bank must be divorced from McDonough is to ignore reality; McDonough made the withdrawals. The question for the jury was whether the Bank knowingly and willfully broke the law by failing to report them.

We have a final comment. When a defendant fails to specifically request an instruction on "a crucial and potentially complex issue of fact for a jury," Appellant's Brief at 24, and then fails to object to the instruction given, one of two conclusions can be drawn: that the defendant deliberately left the matter to the discretion of the trial judge; or it decided to play the waiting game in the hope of getting an appealable error without committing itself. Since we uphold the jury instruction, no more need be said.

*B. Conviction of Thirty-One Felonies*

This issue, which is an extension of the previous one, also involves the construction of 31 U.S.C. § 5322(b). At the time of indictment, the penalty for a violation of § 5322(b) was a fine of $500,000 and/or imprisonment for not more than five years. Section 5322(a) made a violation a misdemeanor with a fine of not more than $1,000 and/or imprisonment for not more than one year.[6] The question is whether each of the thirty-one violations that was "part of a pattern of illegal activity involving transactions of more than $100,000 in a 12–month period" may be separately prosecuted as a felony or whether a pattern of violations within a 12–month period constitutes only a single felony offense. The district court ruled that, if a pattern of illegal activity was proven, each violation constituted a felony. The Bank duly objected to this construction of the statute.

■ Although the Bank argues that the ruling rewrote the statute in defiance of precedent, we find that the district court's

---

6. 31 U.S.C. § 5322(b) has since been amended to increase the maximum prison term to ten years. Section 5322(a) has been amended to provide for a fine of not more than $250,000 and/or imprisonment for not more than five years, thus making any violation a felony.

ruling comports with the plain language of the statute and its legislative history and has solid precedential support. The statute makes it a crime for a person to violate the subchapter *"as part* of a pattern of illegal activity." The words "as part" can only refer to a single violation. In order for subsection (b) to apply, there must be "a pattern of illegal activity involving transactions exceeding $100,000 in any 12–month period." A pattern, by any definition, must consist of more than one failure to report. It is not the pattern that is proscribed, but the willful violation that is a part of the pattern. As the court noted in *United States v. Kattan-Kassin,* 696 F.2d 893 (11th Cir.1983), an absurd result can occur if the felony is limited to the pattern of violations: "after committing two violations involving more than $100,000, a violator would be immune from prosecution [under § 5322(b)] for the remainder of the twelve-month period, subject only to minor misdemeanor penalties." *Id.* at 896.

There can be no doubt that the legislative history of section 5322(b) and its predecessor, 31 U.S.C. § 1059, shows that Congress intended that the section be used to punish violators severely. *See United States v. Valdes-Guerra,* 758 F.2d at 1414; *United States v. So,* 755 F.2d 1350, 1355 (9th Cir.1985); *United States v. Dickinson,* 706 F.2d at 92; *United States v. Kattan-Kassin,* 696 F.2d at 897; *United States v. Beusch,* 596 F.2d at 879. Severe punishment can best be assured by treating as a separate felony each violation that is "part of a pattern of illegal activity involving transactions exceeding $100,000 in any 12–month period." 31 U.S.C. § 5322(b).

Although both the Ninth and Eleventh Circuits concur that Congress intended to punish severely those who repeatedly violate the Act's reporting requirements, they differ as to how best to implement that legislative intent. The Ninth Circuit does not regard any transaction as felonious *until* the $100,000 threshold has been reached, *United States v. So,* 755 F.2d at 1355; thereafter, every transaction is treated as a felony. The Eleventh Circuit, as we have already noted, treats every transaction as felonious *if* the $100,000 thresh-

old is reached within a twelve-month period. Thus, under the Ninth Circuit's approach, there would be twenty-one felonies; under the Eleventh Circuit's approach, there would be thirty-one felonies. No matter which approach we adopt, the verdict stands since the fine levied against the Bank was far below that which could have been imposed under either approach. Both the Ninth Circuit and the Eleventh Circuit have advanced plausible constructions of the Act's felony provision. Because we are convinced that Congress wished to impose the severest possible penalty on repeated violators of the Act, we adopt the approach taken by the Eleventh Circuit in *Kattan-Kassin:* if a pattern of illegal activity involving transactions exceeding $100,000 is proven, each violation is a felony. We, therefore, affirm the district court's ruling and find no error in the jury instruction on this issue.

## IV. WILLFULNESS OF THE BANK'S CONDUCT

### A. The Trial Court's Instruction on Willfulness

 Criminal liability under 31 U.S.C. § 5322 only attaches when a financial institution "willfully" violates the CTR filing requirement. A finding of willfulness under the Reporting Act must be supported by "proof of the defendant's knowledge of the reporting requirements and his specific intent to commit the crime." *United States v. Hernando Ospina,* 798 F.2d 1570, 1580 (11th Cir.1986); *United States v. Eisenstein,* 731 F.2d 1540, 1543 (11th Cir. 1984). Willfulness can rarely be proven by direct evidence, since it is a state of mind; it is usually established by drawing reasonable inferences from the available facts. *United States v. Wells,* 766 F.2d 12, 20 (1st Cir.1985).

The Bank contends that the trial court's instructions on knowledge and specific intent effectively relieved the government of its responsibility to prove that the Bank acted willfully. The trial judge began her instructions on this element by outlining

generally the concepts of knowledge and willfulness:

> Knowingly simply means voluntarily and intentionally. It's designed to exclude a failure that is done by mistake or accident, or for some other innocent reason. Willfully means voluntarily, intentionally, and with a specific intent to disregard, to disobey the law, with a bad purpose to violate the law.

■ The trial judge properly instructed the jury that it could infer knowledge if a defendant consciously avoided learning about the reporting requirements. The court then focused on the kind of proof that would establish the Bank's knowledge of its filing obligations. The judge instructed that the knowledge of individual employees acting within the scope of their employment is imputed to the Bank. She told the jury that "if any employee knew that multiple checks would require the filing of reports, the bank knew it, provided the employee knew it within the scope of his employment,...."

The trial judge then focused on the issue of "collective knowledge":

> In addition, however, you have to look at the bank as an institution. As such, its knowledge is the sum of the knowledge of all of the employees. That is, the bank's knowledge is the totality of what all of the employees know within the scope of their employment. So, if Employee A knows one facet of the currency reporting requirement, B knows another facet of it, and C a third facet of it, the bank knows them all. So if you find that an employee within the scope of his employment knew that CTRs had to be filed, even if multiple checks are used, the bank is deemed to know it. The bank is also deemed to know it if each of several employees knew a part of that requirement and the sum of what the separate employees knew amounted to knowledge that such a requirement existed.

After discussing the two modes of establishing knowledge—via either knowledge of one of its individual employees or the aggregate knowledge of all its employees—the trial judge turned to the issue of specific intent:

> There is a similar double business with respect to the concept of willfulness with respect to the bank. In deciding whether the bank acted willfully, again you have to look first at the conduct of all employees and officers, and, second, at what the bank did or did not do as an institution. The bank is deemed to have acted willfully if one of its employees in the scope of his employment acted willfully. So, if you find that an employee willfully failed to do what was necessary to file these reports, then that is deemed to be the act of the bank, and the bank is deemed to have willfully failed to file.
>
> ....
>
> Alternatively, the bank as an institution has certain responsibilities; as an organization, it has certain responsibilities. And you will have to determine whether the bank as an organization consciously avoided learning about and observing CTR requirements. The Government to prove the bank guilty on this theory, has to show that its failure to file was the result of some flagrant organizational indifference. In this connection, you should look at the evidence as to the bank's effort, if any, to inform its employees of the law; its effort to check on their compliance; its response to various bits of information that it got in August and September of '84 and February of '85; its policies, and how it carried out its stated policies.
>
> ....
>
> If you find that the Government has proven with respect to any transaction either that an employee within the scope of his employment willfully failed to file a required report or that the bank was flagrantly indifferent to its obligations, then you may find that the bank has willfully failed to file the required reports.

The Bank contends that the trial court's instructions regarding knowledge were de-

fective because they eliminated the requirement that it be proven that the Bank violated a known legal duty. It avers that the knowledge instruction invited the jury to convict the Bank for negligently maintaining a poor communications network that prevented the consolidation of the information held by its various employees. The Bank argues that it is error to find that a corporation possesses a particular item of knowledge if one part of the corporation has half the information making up the item, and another part of the entity has the other half.

A collective knowledge instruction is entirely appropriate in the context of corporate criminal liability. *Riss & Company v. United States*, 262 F.2d 245, 250 (8th Cir.1958); *Inland Freight Lines v. United States*, 191 F.2d 313, 315 (10th Cir. 1951); *Camacho v. Bowling*, 562 F.Supp. 1012, 1025 (N.D.Ill.1983); *United States v. T.I.M.E.–D.C., Inc.*, 381 F.Supp. 730, 738–39 (W.D.W.Va.1974); *United States v. Sawyer Transport, Inc.*, 337 F.Supp. 29 (D.Minn.1971), *aff'd*, 463 F.2d 175 (8th Cir. 1972). The acts of a corporation are, after all, simply the acts of all of its employees operating within the scope of their employment. The law on corporate criminal liability reflects this. *See, e.g., United States v. Cincotta*, 689 F.2d 238, 241, 242 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *United States v. Richmond*, 700 F.2d 1183, 1195 n. 7 (11th Cir. 1983). Similarly, the knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation. *Steere Tank Lines, Inc. v. United States*, 330 F.2d 719, 722 (5th Cir.1964). Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation:

[A] corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual who then would have comprehended its full import. Rather the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly.

*United States v. T.I.M.E.–D.C., Inc.*, 381 F.Supp. at 738. Since the Bank had the compartmentalized structure common to all large corporations, the court's collective knowledge instruction was not only proper but necessary.

Nor do we find any defects in the trial court's instructions on specific intent. The court told the jury that the concept of willfulness entails a voluntary, intentional, and bad purpose to disobey the law. Her instructions on this element, when viewed as a whole, directed the jury not to convict for accidental, mistaken or inadvertent acts or omissions. It is urged that the court erroneously charged that willfulness could be found via flagrant indifference by the Bank toward its reporting obligations. With respect to federal regulatory statutes, the Supreme Court has endorsed defining willfulness, in both civil and criminal contexts, as "a disregard for the governing statute and an indifference to its requirements." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127 & n. 20, 105 S.Ct. 613, 625 & n. 20, 83 L.Ed.2d 523 (1985); *United States v. Illinois Central R. Co.*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938); *accord Stein Distributing Company v. Dept. of Treasury Bureau of Alcohol, Tobacco & Firearms*, 779 F.2d 1407, 1413 (9th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 1963, 90 L.Ed.2d 649 (1986); *United States v. Dye Construction*, 510 F.2d 78, 82 (10th Cir.1975); *F.X. Messina Construction Corp. v. Occupational Safety and Health Review Commission*, 505 F.2d 701, 702 (1st Cir.1974); *United States v. Tarver*, 642 F.Supp. 1109 (D.Wyo.1986); *United States v. T.I.M.E.–D.C., Inc.*, 381 F.Supp. at 740–41. Accordingly, we find

no error in the court's instruction on willfulness.

### B. Evidence of Willfulness

The Bank asserts that the evidence did not suffice to show that it had willfully failed to comply with the Act's reporting requirements. We review the evidence in the light most favorable to the government. *United States v. Medina*, 761 F.2d 12, 16 n. 3 (1st Cir.1985); *United States v. Tierney*, 760 F.2d 382, 384 (1st Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

As already discussed, the language of the Treasury regulations itself gave notice that cash withdrawals over $10,000 were reportable, regardless of the number of checks used. Primary responsibility for CTR compliance in the Bank's branch offices was assigned to head tellers and branch managers. Head tellers Orlandella and Murphy, who knew of the nature of McDonough's transactions, also knew of the CTR filing obligations imposed by the Bank. The jury heard testimony from former bank teller Simona Wong, who stated that she knew McDonough's transactions were reportable, and that the source of her knowledge was head teller Murphy.

██ Even if some Bank personnel mistakenly regarded McDonough as engaging in multiple transactions, there was convincing evidence that the Bank knew that his withdrawals were reportable. An internal memo sent in May 1983 by project coordinator Jayne Brady to all branch managers and head tellers stated that " '[r]eportable transactions are expanded to include multiple transactions which aggregate more than $10,000 in any *one day*.' This includes deposits or withdrawals by a customer to or from more than one account." (Emphasis in original.) The Prudential Branch Manual instructed that if Bank personnel know that a customer has engaged in multiple transactions totalling $10,000 or more, then such transactions should be regarded as a single transaction. In addition, since 1980, the instructions on the back of CTR forms have directed that re-

ports be filed on multiple transactions which aggregate to over $10,000. Finally, a Bank auditor discussed with Orlandella and Murphy, the Bank's obligation to report a customer's multiple transactions in a single day which amount to more than $10,000. We do not suggest that these evidentiary items in themselves legally bound the Bank to report McDonough's transactions; it is the language of the regulations that impose such a duty. This evidence, however, proved that the Bank had ample knowledge that transactions like McDonough's came within the purview of the Act.

██ Regarding the Bank's specific intent to violate the reporting obligation, Simona Wong testified that head teller Patricia Murphy knew that McDonough's transactions were reportable, but, on one occasion, deliberately chose not to file a CTR on him because he was "a good customer." In addition, the jury heard testimony that bank employees regarded McDonough's transactions as unusual, speculated that he was a bookie, and suspected that he was structuring his transactions to avoid the Act's reporting requirements. An internal Bank memo, written after an investigation of the McDonough transactions, concluded that a "person managing the branch would have to have known that something strange was going on." Given the suspicions aroused by McDonough's banking practices and the abundance of information indicating that his transactions were reportable, the jury could have concluded that the failure by Bank personnel to, at least, inquire about the reportability of McDonough's transactions constituted flagrant indifference to the obligations imposed by the Act.

We hold that the evidence was sufficient for a finding of willfulness.

### C. Instructions Pertaining to the Bank's Post-July 1984 Conduct

At trial, the government introduced evidence of the Bank's CTR compliance efforts after July 31, 1984, the last date on which the Bank was charged with failing to

file a CTR. On August 7, 1984, the Bank learned that McDonough's transactions were being investigated by law-enforcement agencies. In addition, the branch manager and head teller were told specifically that McDonough's transactions were reportable. The government introduced evidence of the Bank's conduct after July 1984, which could be found to show scant effort by the Bank to comply with its legal obligations, even after it had learned that McDonough had come under suspicion. The Bank's failure to file a CTR on McDonough's July 31, 1984, transaction was highlighted specifically. The government argued that when the Bank was told directly by law enforcement officers on August 7 that McDonough's transactions were reportable, it should have at least completed a CTR on the July 31 withdrawal, while it still had time to meet the statute's fifteen-day filing deadline. The government also pointed to the fact that between August 1984 and May 1985 there occurred a flurry of law-enforcement activity surrounding McDonough's transactions with the Bank. The Bank, however, did not make any effort to report McDonough's 1983 and 1984 transactions until May 1985, after it received a federal grand jury subpoena.

This evidence was admitted originally on the Count One conspiracy charge which the trial court dismissed after all testimony had been taken. The Bank did not move to strike this evidence once the conspiracy charge was dismissed. During closing argument, the government urged that the post-July 1984 evidence manifested the Bank's disregard of its reporting duty, and thus inferentially illuminated its mental state during the time period charged in the indictment. The trial court instructed the jury that it could consider post-July 1984 conduct as probative of the Bank's intent to violate the Act. Specifically, the court told the jury that the evidence might shed light on whether the Bank had been flagrantly indifferent to its reporting obligations.

The Bank made a timely objection to this instruction. It argued that the Act's statutory and regulatory language prohibited a finding of willfulness based on evidence beyond the fifteen-day deadline for filing CTRs on reportable transactions. The Bank also avers that the judge's instructions invited the jury to convict it for acts not charged as violations in the indictment.

■ A common sense reading of the statute and its regulations suggests that the fifteen-day filing deadline simply marks the commencement of the offense. Federal Rule of Evidence 404(b)[7] has been held to allow the admission of acts or conduct subsequent to the offense charged to prove intent to commit the alleged illegal act.[8] *United States v. Whalely,* 786 F.2d 1229, 1232–33 (4th Cir.1986); *United States v. Hurley,* 755 F.2d 788, 790 (11th Cir.1985); *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1149 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978); *United States v. Gallo,* 543 F.2d 361, 364–65 (D.C.Cir.1976). In prosecutions for willful failure to file tax returns, for example, the element of willfulness may be shown by conduct subsequent to the date on which the return was due. *United States v. Sempos,* 772 F.2d 1, 2 (1st Cir.1985);

---

**7.** Federal Rule of Evidence 404(b) provides:

> **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**8.** *United States v. Bourque,* 541 F.2d 290 (1st Cir.1976), relied on by the Bank, does not hold

to the contrary. In *Bourque,* the issue was whether subsequent conduct by the defendant could be used to establish the *actus reus*—the failure to file a tax return on a prescribed date. In the instant case, the criminal act—the defendant's failure to file CTRs—is established. The issue is whether the Bank possessed the requisite mental state. Nothing in *Bourque* suggests that the prosecution is barred from using subsequent conduct to shed light on the defendant's *mens rea* at the time of the commission of the criminal act.

*United States v. Richards,* 723 F.2d 646, 648–49 (8th Cir.1983); *United States v. Serlin,* 707 F.2d 953, 959 (7th Cir.1983). We note also that the Bank's defense at trial included claims that the nonreporting of these transactions occurred accidentally or by mistake. Rule 404(b) invites the admission of relevant instances of subsequent conduct to show "absence of mistake or accident." Because the Bank did not move to strike the evidence after Count One was dismissed, and since Rule 404(b) allows the admission of subsequent conduct to show a defendant's mental state at the time of the charged offense, we uphold the district court's instruction that post-July 1984 conduct was probative of the Bank's mental state.[9]

■ We also reject the Bank's contention that the trial judge's reference to the post-July 1984 evidence in her instructions regarding willfulness invited the jury to convict for conduct not charged in the indictment. Viewing the instructions as a whole, we do not think that this reference prejudiced the Bank in any significant way. The trial judge instructed the jury that it should only consider the charges specified in the indictment. She stressed that the offenses charged were thirty-one failures to file CTRs within fifteen days of handling a reportable transaction. She stated that such failures must be willful. The trial judge mentioned the post-July 1984 evidence only once, specifying that the jury should consider this evidence in connection with the element of willfulness.

In *United States v. Baskes,* 649 F.2d 471 (7th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981), the defendant objected to the trial judge's instruction to the jury that subsequent act evidence could be considered to shed light on the defendant's intent to commit the charged offense. The defendant urged

that "additional illegalities could be inferred from the [subsequent act] evidence and ... might confuse the issue and mislead the jury." *Id.* at 480. The Seventh Circuit upheld the charge, noting that the trial judge instructed the jury that it could only consider the evidence as it related to the defendant's intent. *Id.* at 481. It would have been preferable if the trial judge here had directly and specifically informed the jury that the post-July 1984 evidence could be considered only on the issue of the Bank's state of mind before July 1984. It is significant, however, that this evidence was mentioned only once, in direct connection with the instructions on the element of specific intent. The trial judge had already carefully instructed the jury to disregard the conspiracy charge against the defendants, which involved alleged criminal conduct by the Bank after July 1984. Moreover, the jury was given a redacted copy of the indictment which lacked any reference to conduct engaged in by the Bank after July 1984, and instructed only to consider the charges, "outlined by date," specified therein. Viewed as a whole, the instructions provided sufficient guidance to the jury that the post-July 1984 evidence was relevant only to the intent with which the Bank committed the offenses charged in the redacted indictment.

*Affirmed.*

---

**9.** We reject the suggestion by *amicus,* the Massachusetts Bankers Association, that our endorsement of the trial court's instruction makes a continuing offense out of a failure to file a CTR within fifteen days of handling a reportable transaction. The act constituting the offense is established after fifteen days. Conduct beyond the fifteen-day filing period is not relevant to whether the offensive act was committed, but only to the mental state with which the act was committed.