## In re WORLDCOM, INC. SECURITIES LITIGATION.

### 02 Civ. 3288(DLC).

United States District Court,
S.D. New York.

Jan. 18, 2005.

Max W. Berger, John P. Coffey, Steven B. Singer, Chad Johnson, Beata Gocyk–Farber, John C. Browne, Jennifer L. Edlind, David R. Hassel, Bernstein Litowitz Berger & Grossman LLP, New York City, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant, Barrack, Rodos & Bacine, Philadelphia, PA, for Lead Plaintiff in the Securities Litigation.

Eliot Lauer, Michael Moscato, Michael Hanin, Daniel Marcus, Aviva Wein, Curtis, Mallet–Prevost, Colt & Mosle LLP, New York City, for Defendant Arthur Andersen LLP.

## OPINION AND ORDER

COTE, District Judge.

On March 24, 2000, Arthur Andersen LLP ("Andersen") certified that the financial statements of WorldCom, Inc. ("WorldCom") "present fairly, in all material respects, the financial position of WorldCom, Inc. and subsidiaries as of December 31, 1999." It made parallel certifications on March 30, 2001, and March 7, 2002, for the WorldCom financial statements for fiscal years 2000 and 2001. Because of these certifications, Andersen faces claims in this securities class action under both the Securities Act of 1933 ("Securities Act"), which has a strict liability standard, and the Securities Exchange Act of 1934 ("Exchange Act"), whose fraud provision requires the plaintiff to prove that Andersen acted with scienter.

Following the close of discovery, Andersen has moved for partial summary judgment. It asserts that there is insufficient evidence that the 1999 WorldCom financial statements were materially false. With respect to the 1999 audit only and relying principally on the report of its expert, it also asks for summary judgment on its due diligence defense, arguing that it has established that its conduct of the audit for that year conformed with Generally Accepted Auditing Standards ("GAAS"). Finally, it asserts that there is no evidence that it acted with scienter with respect to its audit of any of these three financial statements and that judgment should be entered in its favor on the Exchange Act claim. For the following reasons, the motion for partial summary judgment is denied.

### Background

WorldCom announced on June 25, 2002, that as a result of an internal audit of its capital expenditure accounting, it had determined that its financial statements for

2001 and the first quarter of 2002 were not issued in conformity with Generally Accepted Accounting Principles ("GAAP"). On July 21, WorldCom filed for bankruptcy. Upon emerging from bankruptcy earlier this year, WorldCom restated its financial statements for 2000 and 2001 ("Restatement"), with approximately $76 billion in adjustments. Andersen has withdrawn its audit opinion for the 2001 WorldCom financial statements, but not for the 1999 or 2000 WorldCom financial statements.

Securities litigation over WorldCom's financial statements began in 2002, even before the dramatic June 25 announcement. The class action litigation was consolidated on August 15, 2002, and the New York State Common Retirement Fund was appointed lead plaintiff ("Lead Plaintiff"). The class action litigation and the actions filed on behalf of individual plaintiffs ("Individual Actions") were consolidated on December 23, 2002, see In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2002 WL 31867720 (S.D.N.Y. Dec. 23, 2002), and are collectively referred to as the Securities Litigation. The WorldCom civil litigation pending in federal courts across the nation has been transferred to this Court by the Judicial Panel on Multi-District Litigation.

The defendants in the consolidated class action include former WorldCom executives Bernard J. Ebbers ("Ebbers") and Scott Sullivan ("Sullivan"), the company's CEO and CFO, respectively; WorldCom directors; the investment banks that underwrote two large WorldCom bond offerings in 2000 and 2001 ("Underwriter Defendants"); Citigroup, Inc., Citigroup Global Markets Inc. f/k/a Salomon Smith Barney Inc. ("SSB") and Jack B. Grubman (collectively "Citigroup Defendants"), who are alleged to be responsible for the issu-

ance of misleading analyst reports urging investors to buy WorldCom securities;[1] and WorldCom's long-term outside auditor, Andersen. The motions to dismiss the claims against most of the defendants were largely denied in May 2003. See In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392 (S.D.N.Y.2003). The motion to dismiss the claims against Andersen and certain Andersen affiliates and partners was granted in part in June 2003. See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2003 WL 21488087 (S.D.N.Y. June 25, 2003). As a result of the latter Opinion, the claims against the Andersen affiliates and partners were dismissed.

The class action complaint names Andersen in a Securities Act Section 11 claim based on its 1999 and 2000 audits. This claim seeks damages in connection with the WorldCom May 2000 bond offering ("2000 Offering") and the WorldCom May 2001 bond offering ("2001 Offering"). The 2000 Offering was for $5 billion; the 2001 Offering was for $11.9 billion and was the largest public debt offering in United States history. WorldCom's audited financial statements for the year ending December 31, 1999 were incorporated by reference into the registration statement for the first of the two offerings, as was Andersen's certification of those financial statements. Its certification of the financial statements for the year ending December 31, 2000 was incorporated by reference into the registration statement for the 2001 Offering. Andersen is also named in an Exchange Act Section 10(b) claim for its audits of the 1999, 2000, and 2001 financial statements.

The class was certified on October 24, 2003. See In re WorldCom, Inc. Sec. Litig., 219 F.R.D. 267 (S.D.N.Y.2003). Fact discovery in the Securities Litigation ended on July 9, 2004.[2] On December 15, the

1. SSB was also a lead underwriter in the two WorldCom bond offerings.

2. The discovery of plaintiffs in the Individual Actions remains to be done.

summary judgment motion filed by the Underwriter Defendants was largely denied. *See In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d 628 (S.D.N.Y.2004). The class action trial begins on February 28, 2005.

The following facts are either undisputed, or as shown by the Lead Plaintiff, unless otherwise indicated. These facts, which are drawn from the parties' substantial submissions, provide background to the legal discussion that follows. Included with this background material is a description of GAAS and the audit process.

*Line Cost Fraud*

WorldCom was a telecommunications company that grew through the acquisition of other companies. By 1998, and through its acquisition of MCI Communications ("MCI"), it became the second largest telecommunications company in the world. By the late 1990s, it faced intense competition due to regulatory and technological changes. *See id.* at 638–39.

To improve the reporting of its financial results, senior management of WorldCom began an illegal manipulation of the public reporting of the company's line costs in the first quarter of 2001 by shifting a portion of them to capital expenditures accounts. Line costs are the costs incurred by WorldCom for the transmission of voice and data over other carriers' networks and were WorldCom's single largest operating expense. Because of their importance as a signifier of WorldCom's financial health, WorldCom's line costs were separately reported as a line item on its financial statements. In carrying out their scheme, WorldCom management would review the financial results toward the end of each quarter and decide how much to shift. The capitalization of line costs was a violation of GAAP and was criminal. *See id.* at 640–41.

The improper capitalization continued through the first quarter of 2002 until the fraud was uncovered by WorldCom's internal audit department. During a meeting on May 21, the WorldCom director in charge of tracking capital expenditures used the term "prepaid capacity" to explain the difference between two sets of schedules that he was being shown. Unfamiliar with that term, the internal audit group asked more questions of several people, but got no satisfactory answers. Using a new software tool, the internal audit group then uncovered the transfer of line costs to capital accounts in a matter of hours. On June 17, WorldCom's controller admitted that there was no support for the transfers. *See id.* at 642–43.

WorldCom actively concealed the line cost capitalization scheme from Andersen. For instance, on August 16, 2001, Andersen advised WorldCom that it would be testing WorldCom's capital expenditure process. On August 22, one of the conspirators ordered the transfer of $544 million of line costs, which had been capitalized after the first quarter of 2001, out of the account in which they had been placed and into ten newly created fixed-asset accounts, which were classified as fiber-optic cable.

Andersen has also offered evidence that long before the illegal capitalization of line costs began in 2001, WorldCom management acted to conceal its accounting practices from auditors, presumably including Andersen. In October 1999, a member of WorldCom's Financial Planning Department created a cash report that tried to tie WorldCom's accrual accounting back to its cash accounting. His report could not connect the two sets of figures, and he was given a one page list of adjusting entries that were done at such a "high level" that he couldn't make any sense of it. The employee went to Buddy Yates, the Director of General Accounting, and told him that he needed to understand the one page

list of adjusting entries better. Yates said, "if you show that . . . piece of paper to our auditors, I'll throw you out that . . . window."

Although all parties agree that the capitalization of line costs was illegal, the Lead Plaintiff contends that the WorldCom financial statements from 1999 onward contained material misstatements designed to inflate the reporting of revenue. As a consequence, Andersen's annual audits for the years 1999 through 2001 are each at issue in this litigation.

*GAAS and the Audit Process*

Through financial reporting, businesses provide information that is intended to be useful to investors, creditors, and others who must make rational decisions about the company but who do not have access to the internal records of the company. Because outsiders are expected to rely on financial statements, the statements are to be presented in a way that is comprehensible to an informed and careful reader. The overarching goal of financial reporting is

> to provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions. The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence.

Financial Accounting Standards Board ("FASB"), Statement of Financial Ac-

counting Concepts No. 1 (1978).[3] In order to make accounting information useful, preparers must aim to make the information reliable, truthful, verifiable, and most importantly understandable. FASB, Statement of Financial Accounting Concepts No. 2 (1980).

■ Financial statements are to be prepared by a company in accordance with GAAP. There are "19 different GAAP sources." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). When a conflict among these sources arises, "the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." *Id.* The "single unified purpose" of GAAP is "to increase investor confidence by ensuring transparency and accuracy in financial reporting." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 339 (S.D.N.Y.2004).

As the Supreme Court has noted,

> GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time. GAAP changes and, even at any one point, is often indeterminate. The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.

Accounting Principles and Standards, SEC Release No. AS–150, 1973 WL 149263, at *1 (Dec. 20, 1973). FASB's Statements of Financial Accounting Concepts set out the fundamentals on which its financial accounting and reporting standards are based. The statements on concepts do not establish GAAP, but inform the Board's GAAP pronouncements.

**3.** The Financial Accounting Standards Board is an independent private sector organization that since 1973, has been the "designated organization in the private sector for establishing standards of financial accounting and reporting." FASB, Facts About FASB, *available at* http://www.fasb.org/facts/index.html. These standards have been recognized by the SEC as authoritative. *See* Statement of Policy on the Establishment and Improvement of

*Guernsey Mem'l Hosp.*, 514 U.S. at 100, 115 S.Ct. 1232 (citation omitted). Indeed, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979); *see also In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 675 (3d Cir.2002). Although financial accounting is a "process that involves continuous judgments and estimates," it nevertheless has "as its foundation the principle of conservatism, with its corollary that possible errors in measurement should be in the direction of understatement rather than overstatement of net income and net assets." *Guernsey Mem'l Hosp.*, 514 U.S. at 100, 115 S.Ct. 1232 (citation omitted).

■ It is the task of the auditor to "ensure, within the parameters of the audit letter, that accounts comply with sound accounting practice. The accountant's duty is to do this regardless of pressure from managers to present the company's financial status as favorably as they can." *AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 228 (2d Cir.2000) (Jacobs, J., concurring). In conducting an audit, an auditor must follow the standards that constitute GAAS. The American Institute of Certified Public Accountants ("AICPA") is the author of the ten GAAS standards. *See* Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1, § 150 (American Inst. of Certified Pub. Accountants 2001).[4] These ten standards are divided among three categories: General Standards, Standards of Field Work, and Standards of Reporting. Compliance with GAAS is mandatory. AU § 161.01. Those of particular importance to this litigation include:

— *General Standard 2:* "In all matters relating to the assignment, an inde-pendence in mental attitude is to be maintained by the auditor or auditors."

— *General Standard 3:* "Due professional care is to be exercised in the performance of the audit and the preparation of the report."

— *Standard of Field Work 2:* "A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed."

— *Standard of Field Work 3:* "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

AU § 150.02.

In addition to the ten standards that comprise GAAS, the AICPA's Auditing Standards Board has also developed Statements on Auditing Standards ("Statements"), which serve as "interpretations of generally accepted auditing standards." AU § 100; *see also Vladimir v. Deloitte & Touche LLP*, No. 95 Civ. 10319(RPP), 1997 WL 151330, at *4 n. 6, 1997 U.S. Dist. LEXIS 3823, at *14 n. 6 (S.D.N.Y. Mar. 31, 1997). These Statements are set forth in a several-hundred page volume, and although they are not intended to be as authoritative as a pronouncement by the Auditing Standards Board, the AICPA "requires that members be prepared to justify departures from such Statements." AU § 100. Several of the Statements are of particular importance to this litigation.

First, GAAS is concerned with the reliable presentation of a company's financial position as a whole. The objective of an audit is to express an opinion on the fairness, in all material respects, with which a

---

4. For purposes of brevity, GAAS and the related Statements on Auditing Standards will be cited as AU § ___, as is the practice within the accounting industry.

company's financial statements present the financial position, results of operations, and cash flows of the company in conformity with GAAP.[5] When an auditor represents that a company's financial statements conform, in all material respects, with GAAP, the auditor "indicates [his] belief that the financial statements *taken as a whole* are not materially misstated." AU § 312.03 (emphasis supplied).[6] Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, *individually or in the aggregate,* is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]." AU § 312.04 (emphasis supplied).

The Statements elaborate on the requirement in General Standard 2 that an auditor maintain independence in attitude. According to the AICPA, an auditor

must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be. However, independence does not imply the attitude of a prosecutor but rather a *judicial impartiality that recognizes an obligation for fairness not only to management and owners* of a business *but also to creditors and those who may otherwise rely* (in part, at least) upon the independent auditor's report, as in

the case of prospective owners or creditors.

AU § 220.02 (emphasis supplied). The auditor, in exercising due professional care, must also employ "professional skepticism," through which "the auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than *persuasive evidence* because of a belief that management is honest." AU § 230.09 (emphasis supplied).

The Statements also provide guidance on how to plan for an audit, which necessitates "developing an overall strategy for the expected conduct and scope of the audit," AU § 311.03, and on how to assess risk as part of that preparation. As the auditor plans an audit, she must assess the risk of material misstatements, taking into account the nature and extent of the company's internal control, and "should specifically assess the risk of material misstatement of the financial statements due to fraud." AU § 312.16. In conducting this latter assessment, the auditor should consider risk factors connected with misstatements from fraudulent financial reporting, such as whether management displays "[a]n excessive interest ... in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices," wheth-

---

5. In one interpretation of GAAS, the AICPA provides:

The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his audit has been made in accordance with

generally accepted auditing standards. These standards require him to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.

AU § 110.01.

6. AU § 312.03 was amended in February 1997 and October 2000.

er there are "[f]ormal or informal restrictions on the auditor that inappropriately limit his or her access to people or information," whether the company reports "assets, liabilities, revenues, or expenses based on significant estimates that involve unusually subjective judgments or uncertainties," and whether the company is facing "[s]ignificant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity." AU § 316.17.

Where an auditor determines that there is a "significant risk of material misstatement of the financial statements," whether due to fraud or other causes, this determination should inform "the nature, timing, or extent of procedures; assigning staff; or requiring appropriate levels of supervision." AU § 312.17. Where higher risk is perceived to exist, for example, the auditor may need "to expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence." *Id.*

Once the auditor has adequately planned for the audit and begins her work, she must obtain and evaluate "sufficient competent" evidence to prove or disprove the financial statements prepared by a company and management's representations about the company and its performance. AU § 326.01. According to the Statements,

> Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor. The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements. These accounting data are often in electronic

form. Accounting data alone cannot be considered sufficient support for financial statements; on the other hand, without adequate attention to the propriety and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted.

AU § 326.15–16.

The Statements make clear that while "representations from management are part of the evidential matter the independent auditor obtains, ... they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02. Significantly, where a representation by management conflicts with other audit evidence, "the auditor should investigate the circumstances and consider the reliability of the representation made." AU § 333.04.

Since examining every transaction is impossible, an auditor examines supporting evidence through "selective testing." AU § 230.11. Nevertheless, an auditor always has the responsibility to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02. Given this, a GAAS-compliant audit operates as "a cumulative process; as the auditor performs planning auditing procedures, the evidence obtained may cause him or her to modify the nature, timing, and extent of other planned procedures." AU § 312.33.

GAAS compliance is imperative. Nonetheless, both parties agree that there are different methodologies for conducting a GAAS-compliant audit. The traditional model is based on substantive auditing procedures; an alternative is a risk-based or control-based audit approach in which the auditor identifies areas of risk that

could affect a financial statement and targets audit efforts to those areas.

*Andersen Audit Procedures at WorldCom*

As of 1999, Andersen had been the auditor for WorldCom or its predecessor companies for almost twenty years. WorldCom was the largest client of Andersen's Jackson, Mississippi office and one of the firm's most significant clients. It issued unqualified or "clean" audit opinions for the WorldCom annual financial statements for 1997 through 2001. As already noted, because of WorldCom's disclosure of the accounting fraud, Andersen withdrew its audit opinion for the WorldCom 2001 Form 10–K, but has not withdrawn its support for the 1999 or 2000 Form 10Ks.

The Andersen audit team for WorldCom as of 1999 included the following individuals. Mark Schoppet ("Schoppet") was the lead engagement partner, and was in that position from 1994 through the audit of the 2000 financial statements. Michael Barry ("Barry") was an Andersen practice director and the concurring partner on the engagement, supervising Kenneth Avery ("Avery"), an engagement manager in Jackson, Mississippi.

Andersen used a worksheet called the SMART Tool to determine whether to accept or retain an audit client. In this process, Andersen gave WorldCom its highest risk rating. In its February 6, 1999 annual assessment, it assigned WorldCom the following ratings in the category of "risk drivers": "good" financial health, "minimal" industry/operations risk, "good" management ability, "minimal" management opportunities risk, "moderate" management pressures, "fair" management integrity and behavior, and "significant" accounting and financial reporting risk. Some of the issues that resulted in the classification of management integrity as "fair" were WorldCom's accounting and disclosure practices, its internal control system, its unresponsiveness to Andersen's advice, problems with unrestricted access to information and personnel and the quality of management's policies to prevent and detect fraud. Andersen's assessment that there was a "significant" risk of misstatements in the WorldCom financial statements was due, at least in part, to the "complex or risky accounts" related to revenue recognition and transactions.

Avery explained to Barry that the financial statement risk had been selected as "significant due to purchase accounting [7] and some of the history with the Company." [8] He also explained in June 1999 that "[f]rom the firm's perspective I agree that there are probably few other engagements where we have a higher risk." On June 13, 1999, Barry advised Avery that the engagement should be rated as a "maximum" risk rather than only a "high" risk. "If this job is not maximum," Barry stated, "none are. Its market capitalization alone would warrant the classification and the additional procedures called for by a max risk client (i.e., RMAP)." [9] As a result, Andersen overrode its SMART program in 1999 to designate WorldCom a maximum risk client, the same classification it had received the prior year.

As Andersen was required to do for all maximum risk clients, and as reflected in a

7. The concept of purchase accounting is described below in connection with the accounting issues for the 1999 financial statements.

8. In his 2004 deposition, Avery explained that the purchase accounting issue to which he was referring in this message was the accounting for the MCI transaction and the numerous other WorldCom acquisitions in which there were significant accounting issues regarding valuation. He explained that there was not a great deal of precedent for how to handle the issue.

9. The parties have not explained the term RMAP.

December 15, 1999 memorandum, Andersen held a meeting to discuss areas that created risk at WorldCom. With respect to fraud, the group's consensus was that the company did not tolerate fraud on an individual level and set that tone at the top. The report from the meeting explained that "while in the past management was aggressive in its application of GAAP in so far as it related to purchase price allocation [10] and fair value of assets and liabilities, they do not intentionally misstate the financial statements." The report added that there had been "few" instances in which Andersen had disagreed with management over accounting adjustments. The group discussed WorldCom's potential to employ aggressive GAAP accounting in several areas, including purchase accounting. It observed that Andersen's audit plan adequately addressed the issues and that its concerns had been communicated to management.[11]

Andersen used a risk-based audit methodology that it called the Business Audit to audit WorldCom. Under the Business Audit approach, auditors were required to perform four key steps: understand WorldCom's business and the industry in which it operated, assess the client's risk controls, determine residual audit risk, and manage residual audit risk. A Business Audit required the creation of a Risk Control Document ("RCD") for those risks identified as being particularly significant. RCDs were supposed to document the work performed in defining and responding to a particular identified risk and establish whether additional procedures were needed to minimize audit risk. The

Lead Plaintiff has pointed to evidence of deficiencies at each of these four stages in Andersen's audit of WorldCom.[12]

For instance, the Lead Plaintiff has pointed to evidence that Andersen appreciated at some level the risk of fraud at WorldCom but did not take adequate steps to detect fraud. Some of the evidence on which it relies in this regard includes the following. An RCD from December 1999 addressed the risk of fraud identified by the Andersen engagement team. It reflected two specific risks: the issue of management integrity and its "highly aggressive accounting policies;" and management pressures, specifically, its desire to "maintain high stock valuations in anticipation of a security offering or a merger." With respect to the first issue, the RCD asserted without explanation that it would continue to monitor the WorldCom accounting policies and to consult with WorldCom management and experts. With respect to the second issue, the RCD indicated that its current audit plan addressed the risk. The memorandum concluded that no modification of its audit plan was necessary.

During a two-day audit planning session in June 2001, the Andersen engagement team brainstormed to create a list of how management, assuming it were corrupt, could intentionally manipulate financial statements and conceal it from Andersen. Among the identified issues were the improper capitalization of expenses as fixed assets and top-side journal entries. These were the very methods that WorldCom management used beginning in the Spring

---

10. This is another reference to the concept of purchase accounting, which is described below.

11. The Lead Plaintiff contends that Andersen's audit plans do not reflect any reasonable planning to uncover and control for the risk of fraud.

12. As described below, because there are questions of fact regarding whether Andersen's audits of WorldCom complied with GAAS, this Opinion does not attempt to describe the parties' competing evidence on this issue.

of 2001 illegally to capitalize line costs. In June 2001, Andersen considered those risks significant in terms of their seriousness, but relatively unlikely to occur.

As far as top-side journal entries were concerned, it appears that Andersen last checked for top-side adjustments in 1999, and found none, or at least no questionable adjustments. The Lead Plaintiff has evidence that in the following years, Andersen simply accepted management's oral representations that no such adjustments had been made.[13] The Lead Plaintiff points out that such a representation was itself a red flag since topside adjustments are not uncommon and can be made for entirely appropriate reasons. The Lead Plaintiff also points out that Andersen never demanded or got unrestricted access to the company's entire general ledger[14] and that its workpapers do not reflect that it ever did the work customarily done to confirm that the financial statements could be traced to general ledger entries. Without performing this analysis, there was no assurance that the financial statements that were being certified came from the books and records that had been audited.[15]

*MCI Merger*

Andersen requests a judgment in its favor for its audit of the 1999 WorldCom financial statements both because there is insufficient evidence that the financial statements were false and because it has shown that, in any event, its audit for that year conformed to GAAS. Lead Plaintiff's allegations concerning the 1999 financial statements principally concern the accounting treatment for assets WorldCom acquired in its merger with MCI in 1998. Therefore, before describing the 1999 WorldCom financial statements, it is important to describe the pertinent events in 1998 that surround the MCI merger.

WorldCom purchased MCI for $47 billion in September 1998. *See In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d at 680 n. 50. Using the purchase method of accounting, WorldCom recorded $29.3 billion of that purchase price as goodwill and decided to depreciate that goodwill over a forty-year period. The Lead Plaintiff contends that too much of MCI's value was attributed to goodwill and that the forty-year depreciation period was far too long. The effect of WorldCom's valuation and depreciation decisions was to reduce the depreciation expense that WorldCom took in 1999 and succeeding years.

The purchase method of accounting may be used to account for an acquisition of one company by another. *See United States v. Winstar Corp.,* 518 U.S. 839, 849, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). When it is used, the "acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and *identifiable intangible assets* less liabilities is recorded as goodwill." Accounting Principles Board Opinion ("APB") No. 16.11 (1970) (emphasis supplied). In this process

---

13. *Inter alia,* Andersen contends that at that time the Standards did not require that topside entries be tested. It refers without specificity or evidentiary support to the auditing of the general ledger which its expert contends confirmed that WorldCom was not making improper top-side entries.

14. WorldCom's general ledger was computerized. Andersen was given printouts from the general ledger or viewed the general ledger from a WorldCom employee's terminal with the employee's assistance. Andersen contends that it was "not commonplace" for an auditor to have unrestricted access to a general ledger.

15. Andersen's workpapers reflect no tracing of the financial statements to the general ledger for either 1999 or 2001, and only an incomplete effort in this regard for 2000.

*all identifiable assets acquired, either individually or by type,* and liabilities assumed in a business combination, whether or not shown in the financial statements of the acquired company, should be assigned a portion of the cost of the acquired company, normally equal to their fair values at date of acquisition. *Id.* at 16.87 (emphasis supplied). After that assignment, goodwill is computed. "[T]he excess of the cost of the acquired company over the sum of the amounts assigned to *identifiable assets* acquired less liabilities assumed should be recorded as goodwill." *Id.* at 16.87 (emphasis supplied). Goodwill, the "excess of the cost of an acquired company over the sum of *identifiable net assets,*" is the "most common unidentifiable intangible asset." APB Opinion No. 17.01 (1970) (emphasis supplied). The cost of each intangible asset is "amortized by systematic charges to income over the period estimated to be benefitted." *Id.* at 17.09. The amortization period may not exceed forty years. *Id.*

In June 1998, Andersen's Valuations Services Group ("VSG") determined that neither MCI's customer base nor work force needed to be valued separately from goodwill. VSG opined:

In the allocation of an acquisition purchase price, other goodwill-type assets may include customer relationships, tradenames, and a work force. In our analysis of MCI, we valued the Company's tradename separately. However, based on our analysis of the Company's business, we believe that MCI's customer relationships and work force have the attributes of "mass assets" or "indivisible assets." Mass assets are certain kinds of intangible assets that are properly grouped and considered as a single entity. Singular elements comprising the asset may change, but the nature or character of the asset as a whole re-

mains constant. A customer base which has the attributes of a mass asset is described as follows:

"a purchased terminable at will type of customer list is an indivisible business property with an indefinite, non depreciable life, indistinguishable from—and the principal element of—goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance. It is subject to temporary attrition as well as expansion through departure of some customers, acquisition of others, and increase or decrease in the requirement of individual customers. A normal turnover of customers represents merely the ebb and flow of a continuing property status in this species."

In addition to the above-described issues concerning goodwill, the parties also address in considerable detail a charge that WorldCom took in 1998 for MCI's in-process research and development ("IPR & D"). On August 10, 1998, the SEC wrote to WorldCom regarding its disclosure of its preliminary estimate that it would take a one-time charge of $6–7 billion for MCI's IPR & D.[16] In a responsive letter of September 25, WorldCom assured the SEC that only the R & D efforts "that are complete" would be included in the charge. The attachment showed an allocation to IPR & D that had been cut in half and reduced to $3.1 billion.

On September 24, the day before it responded to the SEC, Andersen presented WorldCom with its recommendations as to the fair market values of various MCI assets as well as the number of years over which they may be depreciated, a concept known as remaining lives. As noted, the longer the term of years, the less the depreciation expense will be for each of the individual years during the term. An-

---

**16.** The SEC's letter does not appear to be     among the parties' submissions.

dersen valued the MCI tangible assets at $9.4 billion, developed technology at $1.7 billion, IPR & D at $3.1 billion, tradename at $1.1 billion, and goodwill at $23.9 billion. It recommended a remaining life period of 10 years for developed technology and 40 years for tradename and goodwill. The accompanying report indicated that MCI's core business was long-distance telecommunications services and that it had approximately 55,000 employees, of which nearly 2,000 were dedicated to development efforts. It reported that MCI had strong relationships with big corporate customers.

The Andersen report explained that WorldCom's bid to purchase MCI for $47 billion represented a substantial premium over MCI's market capitalization of less than $18 billion. The report described in detail its reasons for valuing the IPR & D at $3.1 billion. With respect to other intangible assets, it noted that an intangible asset had to "fulfill two criteria in order to be distinguished from the goodwill. First, it must have a limited useful life of estimable duration. Second, it must have an ascertainable value separate and distinct from going-concern value." Using this analysis, the Andersen report assigned a separate value to the MCI tradename, but not its customer list or work force. It reasoned

> MCI does not have exclusive contracts to provide telecommunications to its business customers. Therefore, revenue value attributable to any one customer may vary significantly from year to year as customers add and drop products or services or switch between service pro-

viders. Furthermore, with respect to MCI's residential customers, many may leave.... These factors make estimating the useful life and a separable value difficult. Individual customers and employees may come and go, but the relative contribution to MCI from the customers and work force infrastructure will remain fairly steady.... Such mass assets are indistinguishable from goodwill.... This conclusion is in line with the practices of other similar companies in the telecommunications industry.[17]

The Andersen report also described its reasons for choosing forty years as the amortization period for goodwill. It noted that forty years is the maximum amortization period for intangibles, and is only appropriate "when evidence exists that the value and future benefit of goodwill will last forty years or more." It listed eight factors that it considered in assigning a forty-year life to goodwill, including MCI's creation of a successful business model, its position as the second largest long-distance carrier in the country, and its strong base of corporate customers, who provided about two-thirds of the company's long-distance revenue.

On October 7, the SEC wrote to WorldCom regarding its accounting for the purchase of MCI, raising questions about IPR & D, the use of a forty-year term for the economic life for the goodwill, restructuring costs, and the closing date.[18] On October 16, WorldCom responded with a fourteen-page letter. Eight pages were devoted to the IPR & D issue. Four pages addressed the issue of the amortiza-

17. The report apparently included an exhibit that represented that public filings of comparable companies demonstrated that the other companies did not include a specific allocation to customers or work force. Andersen did not include a copy of this exhibit with its submissions so it is impossible to determine whether the public filings of these other com-

panies were sufficiently detailed to permit Andersen to make the assessment described in its report.

18. The parties do not appear to have provided a copy of the October 7 letter with their papers. The topics raised by the SEC are inferred from WorldCom's response.

tion period for goodwill. In those pages, WorldCom revealed that it had considered the amortization practices of other companies and that four recent acquisitions in the telecommunications industry had used forty-year lives for the goodwill.

On October 27, the SEC responded with further questions regarding WorldCom's IPR & D analysis. There was no comment in the SEC letter about the useful life of goodwill.[19]

An October 27, 1998 internal Andersen memorandum, documenting its work regarding IPR & D issues, recognizes that a "rigorous analysis" must be undertaken "to identify all of the tangible and intangible assets acquired." Among intangible assets, it lists both customer lists and work force as potential intangible assets.

*1999 Financial Statements*

In its 1999 Form 10K, WorldCom reported its operating income as approximately $7.888 billion. The Lead Plaintiff's expert calculates that this figure was inflated by $3.224 billion or 40.9 percent. Over $3 billion of the inflation is associated with two entries: $1,417,000 for an incorrect amortization period for MCI goodwill, and $1,601,000 [20] for purchase accounting errors. In essence, the Lead Plaintiff argues that WorldCom attributed too much of the price it paid to acquire MCI to goodwill, and then made a second error by assigning too long a useful life to the goodwill.

The 1999 WorldCom Form 10–K reported that "[t]he allocation of purchase price for the MCI Merger included an allocation to developed technology, which is being depreciated over 10 years on a straight-line basis. The remaining purchase price, which includes allocations to goodwill and tradename, is being amortized over 40 years on a straight-line basis."

On March 24, 2000, Andersen issued the following certification of the WorldCom 1999 financial statements, which was included in the registration statement for the 2000 Offering.

> We conducted our audits *in accordance with audited standards generally accepted in the United States.* Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the report of the other auditors provide a reasonable basis for our opinion.
>
> *In our opinion, based on our audit and the report of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of MCI WORLD-COM, Inc. and subsidiaries as of December 31, 1999 and 1998,* and the re-

19. Andersen argues that the October 16 letter explained that neither the customer base nor the workforce would be segregated from goodwill, and that the SEC's October 27 letter gave approval to this treatment by ignoring the issue. There is no discussion of the customer base or workforce issue in the October 16 letter to support an inference that the SEC had focused on either issue in drafting its response.

20. In the text of his report, Lead Plaintiff's expert uses the figure $1.589 billion. In a chart attached to his report, he uses the figure $1.601 billion. As the discussion that follows indicates, the Lead Plaintiff's submissions do not explain precisely of what the $1.6 billion figure is comprised.

sults of their operations and their cash flows for each of the years in the three-year period ended December 31, 1999, *in conformity with accounting principles generally accepted in the United States.*

(Emphasis supplied.)

As part of the SEC lawsuit brought against WorldCom in 2002, the SEC did not require WorldCom to restate its financials for 1999. Nonetheless, adjustments were made to the closing balances for 1999 as part of the Restatement process. These adjustments were largely if not entirely attributable to WorldCom's acquisition of MCI in September 1998 and the accounting issues that arose from that transaction.

The Restatement concluded that the useful life of goodwill should have been fifteen years instead of forty, and the Lead Plaintiff's expert endorses that conclusion. The estimated useful life is defined by APB Opinion No. 17 as the period over which the asset is expected to provide a benefit to the acquiring company or to contribute directly or indirectly to the future cash flows.[21]

The parties dispute whether the Restatement changed the amortization period from forty years to fifteen years because it deemed the forty year period to be an "error" or because it believed a change was necessary. An error in accounting is different from a change in accounting. An error includes a mistake in the application of GAAP. As the APB has explained,

> Errors in financial statements result from mathematical mistakes, *mistakes in the application of accounting principles,* or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment.

APB Opinion No. 20.13 (1971) (emphasis supplied).

In addition to the issue of the amortization of goodwill, the Lead Plaintiff asserts that the 1999 financial statements reflected purchase accounting errors, specifically, the decision not to recognize separately the MCI workforce and its customer base. MCI had a workforce of over 50,000 employees. The Lead Plaintiff, relying on the valuation work done through the Restatement, places a value on the MCI workforce at $306 million.[22] The Lead

---

21. APB Opinion No. 17.27 reads:

> The Board believes that the value of intangible assets at any one date eventually disappears and that the recorded costs of intangible assets should be amortized by systematic charges to income over the periods estimated to be benefited. Factors which should be considered in estimating the useful lives of intangible assets include:
> a. Legal, regulatory, or contractual provisions may limit the maximum useful life.
> b. Provisions for renewal or extension may alter a specified limit on useful life.
> c. Effects of obsolescence, demand, competition, and other economic factors may reduce a useful life.

> d. A useful life may parallel the service life expectancies of individuals or groups of employees.
> e. Expected actions of competitors and others may restrict present competitive advantages.
> f. An apparently unlimited useful life may in fact be indefinite and benefits cannot be reasonably projected.
> g. An intangible asset may be a composite of many individual factors with varying effective lives. The period of amortization of intangible assets should be determined from the pertinent factors.

*Id.*

22. The Lead Plaintiff does not indicate the amortization period that it believes should have been used for the workforce, but by

Plaintiff has not indicated precisely what value it places on the MCI customer base, but refers to a participant in the Restatement effort indicating that the customer base should have been valued at over $1 billion and amortized over a three to five-year lifespan.

Finally, the Lead Plaintiff emphasizes its contention that WorldCom should not have taken a $3.1 billion charge in 1998 for MCI's IPR & D but should have valued IPR & D as worth no more than $6 million or as worthless.[23] WorldCom retained three outside appraisers to value MCI's IPR & D in 1998. Their valuations ranged from $3.1 to $3.5 billion. The Lead Plaintiff does not explain how this 1998 charge affected the 1999 financial statements or by how much. It appears, however, that the WorldCom Restatement reversed the IPR & D charge and made corresponding adjustments in the restated financial statements for 2000 and 2001.

In 2003, as part of the Restatement process, an analysis was done of the public filings of WorldCom's peers for the years 1993 through 2000 to learn how they treated assets of companies they acquired during this period. Of twenty-nine transactions, only seven included a breakout of intangible assets in their filings. Five of the seven reported assigning a value to the customer base and amortizing that value over a five to thirteen-year period. One of these five acquisitions occurred in each of the years 1997 through 1999, and three occurred in 2000. Three of the seven companies reported assigning a value to the workforce and amortizing that value over a fourteen-year period. Five of the seven reported a net goodwill amortization period of forty years. Other companies that prepared less-detailed financial reporting indicated ranges for amortization of goodwill from three to forty, five to forty, ten to forty and fifteen to twenty years.[24]

In support of summary judgment, Andersen performed a study of telecommunications acquisitions from 1992 to 2000 that had a purchase price of at least $100 million, used purchase method accounting, and disclosed details of the transaction. Andersen contends that only ten of these twenty-five transactions allocated value to the customer base and that only a quarter of those concluded prior to October 1998 did so. It concludes that only six out of the twenty-five allocated value to the assembled workforce and only eight percent of those concluded before October 1998 did so. As for the useful life of goodwill, Andersen's recent study showed that the useful economic life assigned to goodwill ranged from three to forty years; the average and median life was over twenty years, and the "most commonly assigned" life was forty years.

*2000 and 2001 Financial Statements*

The Lead Plaintiff has presented evidence that there were material misstatements in the WorldCom financial statements for both 2000 and 2001. The illegal capitalization of line costs, which occurred in 2001, has already been discussed. In addition, the Lead Plaintiff emphasizes that Andersen was or should have been aware of the following accounting decisions that led to material misrepresentations of WorldCom's financial condition: the assignment of a longer useful life for three assets than was justified; the failure to

implication its calculations are based on an amortization period substantially shorter than forty years.

**23.** Andersen points out that the Restatement valuation of "zero" was done by one of the firms on which Andersen relied for the valua-

tion in 1998, and that in arriving at its current assessment that firm applied two new accounting standards that were not in effect in 1998.

**24.** Andersen's expert argues that the study was flawed in various ways.

conduct an impairment analysis in late 2000 ·or in 2001 to determine whether WorldCom's deteriorating financial condition required it to revalue any of its assets; the manipulation of the company's wireless bad debt reserve; the manipulation of the reported line costs by improperly releasing reserves; and changing the line cost accrual policy without sufficient support for the change. A change in the reserve policy for line costs resulted in a reduction of $206 million in reported expenses in 2000 alone. Specifically, WorldCom maintained a twenty-four month reserve for bills that it estimated it would receive but had not yet received. In the first quarter of 2000, WorldCom shortened the period to twelve months, and by the end of the year, to three months. The effect of these changes was to reduce the reporting of line cost expenses.[25]

### Discussion

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and as such, "always bears the initial responsibility of . . . identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *accord Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir.2002). In making this determination the court must view all facts in the light most favorable to

the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir.2002).

When the moving party has asserted facts showing that it is entitled to summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir.2002). While evidence as a whole must be assessed to determine whether there is a trial-worthy issue, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999), conclusory statements are insufficient to defeat a motion for summary judgment. *Opals on Ice Lingerie v. Body Lines*, 320 F.3d 362, 370 n. 3 (2d Cir.2003). Throughout its consideration of a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004). Thus, in determining whether to grant summary judgment, this Court must (1) determine whether a genuine factual dispute exists based on the admissible evidence in the record; and (2) determine, based on the substantive law at issue, whether the fact in dispute is material.

### Securities Act Claim

█ Andersen has moved for summary judgment on the Securities Act claim brought against it for its certification of the 1999 WorldCom financial statements.

---

**25.** Andersen has not identified any documents to indicate that it analyzed these changes and found them to be supportable under GAAP.

This is the certification that underlies Andersen's liability for the 2000 Offering. Andersen contends that the Lead Plaintiff has failed to present sufficient evidence that there was a material misstatement in the 1999 financial statements. It also contends that it has shown that it is entitled to summary judgment on its affirmative defense of due diligence.

■ Section 11 of the Securities Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).[26] This design reflects Congress' sense that accountants, along with underwriters and issuers, bear a "moral responsibility to the public [that] is particularly heavy." *Gustafson v. Alloyd,* 513 U.S. 561, 581, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., at 5 (1933)).

Section 11 provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 is a strict liability statute. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Unlike other Section 11 defendants, who are liable for any and all

material misstatements or omissions within a registration statement, an accountant may be liable only for those statements "which purport[ ] to have been prepared or certified by him." 15 U.S.C. § 77k(a)(4); *see also Huddleston,* 459 U.S. at 381 n. 11, 103 S.Ct. 683.

■ A recently-issued summary judgment Opinion in this litigation details how a court should assess whether or not a registration statement is materially misleading for purposes of Section 11 liability. *See In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d at 657–58. It is worth reiterating that any inquiry into alleged material misstatements within a registration statement must focus not on whether "particular statements, taken separately, were literally true, but whether defendants' representations, *taken together and in context,* would have misled a reasonable investor about the nature of the securities." *DeMaria v. Andersen,* 318 F.3d 170, 180 (2d Cir.2003) (emphasis supplied).

■ Section 11 provides defendants other than the issuer of the security with an affirmative "due diligence" defense. *See In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d at 658–59, 662–63. Experts, including accountants, may avoid liability with respect to "any part of the registration statement purporting to be made on [their] authority as an expert" where they can show that

> [they] had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective,

**26.** Several prior Opinions in this litigation have described the pertinent law concerning Section 11. *See, e.g., In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d at *656–59; In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d at 439; *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. at 288–290. A recent Opinion addressing the summary judgment motion brought by the Underwriter Defendants in this class action describes the due diligence defenses under Section 11. *See In re WorldCom, Inc. Sec. Litig.,* 346 F.Supp.2d at 662–78. Relying on the extensive discussion in prior Opinions, this Opinion will include an abbreviated discussion of the pertinent legal principles.

*that the statements* therein *were true* and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3)(B) (emphasis supplied) ("Section 11(b)(3)(B)"). This defense is understood "as a negligence standard." *Hochfelder*, 425 U.S. at 208, 96 S.Ct. 1375. In order to prove that he conducted a "reasonable investigation," an expert must demonstrate that he conducted a "searching inquiry." *In re World-Com, Inc. Sec. Litig.*, 346 F.Supp.2d at 677–78. The standard of reasonableness is that which is "required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c).

There is limited guidance in the case law as to the contours generally of the due diligence defense under Section 11. *See In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d at 673–78. There is even less commentary on the application of the defense to accountants. The Ninth Circuit has held that an accountant's "good faith compliance" with GAAP and GAAS "discharges the accountant's professional obligation to act with reasonable care" and establishes the due diligence defense. *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir.1994). The *Hughes* court limited this holding, however, by observing that "compliance with GAAP and GAAS [does] not immunize an accountant who consciously

chooses not to disclose on a registration statement a known material fact." *Id.*

In *Escott v. BarChris Construction Corporation*, 283 F.Supp. 643 (S.D.N.Y.1968), which remains a seminal Section 11 decision, the Honorable Edward C. MacLean of this District rejected the auditor's due diligence defense with respect to certain misstatements in audited financial statements, finding that it failed to make a reasonable investigation. *Id.* at 698–701. Judge MacLean observed in a related context, that "accountants should not be held to a higher standard than that recognized in their profession" and that compliance with GAAS should ordinarily satisfy the due diligence obligation. *Id.* at 703.[27]

■ In sum, an accountant has responsibility under Section 11 for the accuracy of the financial statements she certifies. An unqualified certification customarily asserts that a company's financial statements present fairly, in all material respects, the financial position of the company in conformity with GAAP. The certification applies to each material statement within the financial statements and to the financial statements taken as a whole. To qualify as a "reasonable investigation" of a company's financial statements under Section 11(b)(3)(B), and establish the affirmative defense of due diligence, the accountant must conduct a GAAS-compliant audit, or in the instance of a departure from the Statements on Auditing Standards, show

---

27. In *BarChris*, the accountant was also charged with a violation of Section 11 in connection with the issuance of a comfort letter. For reasons recently explained, an accountant can no longer be liable either for a report on unaudited interim financial information or for a comfort letter issued pursuant to such a report. *See In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d at 663–67. In finding that the accountant had not complied with his obligations to take the steps mandated by his firm's program for following GAAS, Judge MacLean found that the accountant oversee-

ing the review "was too easily satisfied with glib answers to his inquiries." *BarChris*, 283 F.Supp. at 703. As Judge MacLean elaborated,

there were enough danger signals in the materials which he did examine to require some further investigation on his part. Generally accepted accounting standards required such further investigation under these circumstances. It is not always sufficient merely to ask questions.

*Id.*

an objectively reasonable basis for the departure. If in the performance of a GAAS-compliant audit the accountant uncovers a failure, or evidence of a possible failure, of the company to comply with GAAP in presenting its financial statements, then the accountant must further investigate the issue and make the appropriate disclosures.

To demonstrate the existence of material misstatements in the 1999 WorldCom financial statements, the Lead Plaintiff relies principally on three discrete accounting issues arising from the 1998 acquisition of MCI: the forty-year useful life for MCI's goodwill, and the failure to segregate from goodwill two other assets consisting of MCI's workforce and MCI's customer base and to apply the appropriate amortization periods to them.[28] The Lead Plaintiff has shown that there are issues of fact regarding the existence of materially false statements in the 1999 WorldCom financial statements and in the certification of those financial statements by Andersen.

It is undisputed that WorldCom's use of purchase method accounting for the MCI transaction, failure to segregate either the workforce or the customer base, and then the assignment of a forty-year lifespan to the MCI goodwill had the effect of materially reducing the reporting of expenses by WorldCom in its 1999 financial statements. A jury will have to determine whether these choices resulted in a false description of WorldCom's financial state.

In support of its motion, Andersen argues that WorldCom's accounting treatment for the MCI workforce, customer base, and goodwill complied with GAAP as of 1998 and 1999. It contends that few transactions in the telecommunications industry prior to the MCI merger attributed a separate value to the assembled workforce or customer base of the acquired company. With respect to the forty-year amortization period for goodwill, Andersen contends that most telecommunications companies used a forty-year period for amortization of goodwill and that the SEC did not respond when WorldCom explained to the SEC in its October 16 letter the reasons behind its choice of the forty-year period. Andersen also faults the Lead Plaintiff's expert for not performing any independent analysis of these issues and relying instead entirely on the work done in the Restatement process.

While the practices of other companies, and particularly other telecommunications companies, are important considerations, ultimately what is at stake is whether WorldCom's choices in its accounting treatment of the MCI transaction complied with GAAP. The Lead Plaintiff has presented evidence that raises questions of fact as to whether each of these accounting decisions complied with GAAP individually and in the context of their impact on the financial statements of WorldCom taken as a whole. Andersen has not explained why the 1998 correspondence with the SEC regarding the MCI merger and the forty-year amortization period for MCI's goodwill is determinative of whether the 1999 WorldCom financial statements complied with GAAP in this regard.[29] To the extent this evidence is presented to demonstrate

---

28. Although the Lead Plaintiff also spends significant time describing the accounting treatment of MCI IPR & D, it has not sufficiently identified the impact of that accounting treatment on the 1999 financial statements to carry its burden in opposing this summary judgment motion.

29. Among other things, Andersen has not included the entirety of the correspondence, explained the purpose of the SEC's review in 1998 and how that relates to the integrity of the 1999 financial statements, or explained why the SEC's review of an accounting issue in the context of a merger is controlling on the issue of GAAP compliance in this lawsuit.

that Andersen acted in good faith in 1999, the Lead Plaintiff has no burden to show that WorldCom or Andersen acted with scienter in violating Section 11. The Lead Plaintiff need only show that a materially false statement was made.

The Lead Plaintiff has carried its burden of showing that there is a question of fact as to whether it is entitled to rely on the Restatement to establish a failure by WorldCom to comply with GAAP in presenting its 1999 financial statements. To the extent that the Lead Plaintiff proves that the Restatement process did not use hindsight, but restated the original accounting because there were errors, then reliance on the Restatement analysis may be proper. This will require, at a minimum, that the Lead Plaintiff show that a material failure to comply with GAAP exists based on a consideration of information available to WorldCom at the time it issued its financial statements and GAAP as it stood at that time.

The Lead Plaintiff asserts that there was an additional falsity in connection with the 1999 financial statements, to wit, that Andersen had performed a GAAS-compliant audit. Andersen relies on the opinions of its expert and two of its partners that it did perform such an audit. The Lead Plaintiff, however, has presented an abundance of evidence to raise a question of fact as to whether Andersen did comply with GAAS. Some of this evidence is described later in this Opinion.[30]

Finally, while Andersen mentions in passing that it is also moving for summary judgment based on its affirmative defense of due diligence with respect to the 1999 financial statements, it devotes little attention to this prong of its motion. Indeed, its Rule 56.1 Statement relies on a single conclusory fact—that Andersen conducted the 1999 audit in conformity with GAAS—and cites to brief opinion testimony of two of its partners and to one page from its expert's report to support this conclusion. Andersen has not carried its burden to identify with specificity the evidence supporting judgment in its favor; conclusory opinion evidence is insufficient.[31] In any event, the Lead Plaintiff has shown that there are disputed issues of fact regarding Andersen's audit procedures at WorldCom and whether those procedures complied with GAAS.[32]

### Exchange Act Claim

■ With respect to the Section 10(b) claim it faces, Andersen contends that there is no evidence that Andersen auditors intended to cause Andersen to issue false audit opinions. First, Andersen argues that it is entitled to summary judgment on the Section 10(b) claim because the Lead Plaintiff has failed to demonstrate that a particular Andersen auditor acted with scienter. Andersen further asserts that as the 1999, 2000, and 2001 audits complied with GAAS, they cannot be said to have recklessly issued false au-

30. Since there are questions of fact regarding the extent to which the WorldCom financial statements were GAAP-compliant, it is unnecessary to reach the issue, which in any event has not been raised by the parties, of whether a false statement that an auditor had conducted a GAAS-compliant audit would be immaterial as a matter of law where the financial statements were presented in conformity with GAAP.

31. Even if Andersen's Rule 56.1 Statement had referred to the entirety of its expert's

report and detailed the facts on which its expert relies, there would remain questions of fact regarding the existence of a GAAS-compliant audit in 1999.

32. At the end of its reply memorandum, Andersen briefly mentions another argument. It suggests that the misstatements in the 1999 financial statements were not material because they had no effect of the price of the WorldCom bonds in the 2000 Offering. Arguments raised for the first time in a reply memorandum will not be considered.

dit opinions. Finally, Andersen asserts that it should prevail on its motion for summary judgment because conflicting expert opinions as to GAAS and GAAP compliance automatically prevent a finding of recklessness.

■■■ There is extensive law on the standard for pleading a violation of Section 10(b), including the statute's scienter standard. To plead a violation of Section 10(b) of the Exchange Act, a plaintiff must allege that the "defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Rombach v. Chang*, 355 F.3d 164, 169 n. 4 (2d Cir.2004). "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (citation omitted). At the pleading stage, to support a strong inference that the defendant acted with the requisite scienter, a plaintiff must either "1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or 2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rombach*, 355 F.3d at 176.

■■■ Additional commentary from cases addressing the standard for pleading recklessness in the context of alleged violations of GAAP or GAAS underscores the significant burden on a plaintiff in surviving a motion to dismiss. When records of a company's financial impropriety are "hidden from its auditor," an auditor is not held responsible simply because the auditor "lent its 'imprimatur' to the company's financial statement." *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982). Rather, for a defendant's conduct to constitute recklessness, it must be "highly unreasonable, representing an extreme departure from the standards of

ordinary care to the extent that the danger [of fraud] was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) (citation omitted). An auditor's recklessness must "approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Id.* at 98 (citing *Decker*, 681 F.2d at 121). Taking actions that are contrary to one's "expressed policy and prior practice" concerning accounting issues can constitute proof of recklessness. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir.2001). At the pleading stage, however, allegations of a violation of GAAP and GAAS, without more, are insufficient to allege an auditor's scienter. *Rothman*, 220 F.3d at 98 (auditor's alleged violation of GAAP); *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (company's alleged violation of GAAP); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996) (same); *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835(MBM) (auditor's alleged violation of GAAP), 2004 WL 1152501, at *9 (S.D.N.Y. May 24, 2004); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 333–34 (S.D.N.Y.2001) (auditor's alleged violation of GAAP and GAAS).

While there is a wealth of case law regarding the pleading of scienter, there are fewer cases describing the level of proof necessary to show recklessness at trial. There is, nonetheless, significant guidance in this area as well. A quarter of a century ago, in reversing a judgment against an accountant under Section 10(b), the Third Circuit observed that the "core requirement" in proving an auditor's scienter is proof that the defendant "lacked a genuine belief that the information disclosed was accurate and complete in all material respects." *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979). Such proof can be and customarily is presented

through circumstantial evidence. *Id.* Relying on Judge Cardozo's opinion in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931), and Judge Swan's opinion in *O'Connor v. Ludlam,* 92 F.2d 50 (2d Cir.1937), the Third Circuit ruled:

A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the fact finder may justifiably conclude that despite those assertions the danger of misleading was so obvious that the actor must have been aware of it.

*Id.* (citation omitted).

Reflecting on the Section 10(b) scienter standard, the Honorable John E. Sprizzo explained following a bench trial that an auditor's recklessness "requires more than a misapplication of accounting principles." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992). Rather, a Section 10(b) plaintiff

must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* (citation omitted). Judge Sprizzo's formulation has been quoted repeatedly in the context of motions to dismiss, *see, e.g., Philip Servs.,* 2004 WL 1152501, at *9; *Complete Mgmt.,* 153 F.Supp.2d at 333–34; and has been relied upon by courts faced with summary judgment motions. *See, e.g., In re Software Toolworks Inc. Sec. Litig.,* 50 F.3d 615, 628 (9th Cir.1994); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994).

Recently, the Second Circuit found that a plaintiff had proven at trial that an auditor had acted with scienter when the auditor acted in a manner that easily could be "foreseen to result in harm." *AUSA Life Ins. Co.,* 206 F.3d at 221. The auditor had certified financial statements that failed to disclose that the company was "teetering on the edge of demise." *Id.*

Had the [ ] accountants contemplated for a moment the results to which their questionable accounting could lead, they could have imagined that saddling the investors with an undisclosed risk would harm the investors, should the risk be realized. Therefore, one can easily find that [the auditor] possessed the requisite intent to deceive, manipulate, or defraud.

*Id.* In *AUSA,* the auditor knew that the financial statements did not conform to GAAP and informed management of that fact, but acquiesced when management rebuffed its advice. *Id.* at 205, 229. The auditor appreciated that its certification carried great weight and would be "compelling to investors." *Id.* at 221. These facts established its scienter.

It is undisputed that business entities can be primarily liable for a violation of Section 10(b). *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001). A plaintiff can prove scienter by demonstrating that "a large entity, firm, institution, or corporation is acting in a manner that easily can be foreseen to result in harm." *AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 221 (2d Cir.2000) (finding Section 10(b) claim adequately pleaded against auditing firm). It is a fundamental principle that "[a] corporation can only act through its employees and agents." *Suez Equity Investors,* 250 F.3d at 101.

To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient. In *United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir.1987), a bank had been convicted of violating the Currency Transaction Reporting Act, which requires proof of specific intent, and challenged the trial court's jury instruction on knowledge, which provided that jurors would have to "look at the bank as an institution" and understand the bank's knowledge as "the sum of the knowledge of all employees." *Id.* at 855. The bank objected that the trial court's instructions erroneously allowed the jury to find that the bank acted knowingly where "one part of the corporation has half the information making up the item, and another part of the entity has the other half." *Id.* at 856. The First Circuit rejected this argument, finding that a "collective knowledge instruction is entirely appropriate in the context of corporate criminal liability" because a corporation's acts are "simply the acts of all of its employees operating within the scope of their employment." *Id.* As the court explained, "[c]orporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation." *Id.* Consequently, case law abounds with discussions of securities fraud by accounting firms that concentrate on the firm's collective state of mind, not that of

individual partners or employees.[33] *See, e.g., Chill,* 101 F.3d 263, 269–70; *Philip Servs.,* 2004 WL 1152501, at *7–8 (accounting firm); *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d 290, 295 (S.D.N.Y.1999) (same). *See also Press,* 166 F.3d at 538.

The Lead Plaintiff has shown that there are issues of fact as to whether the Andersen audit of WorldCom was so deeply flawed that Andersen acted with reckless disregard of whether WorldCom was engaged in fraudulent accounting practices and materially misstating its financial position in its annual financial statements. It points to an over-reliance on the integrity of management and a failure to maintain its own independence, including the sharing with management of the materiality limits for its auditing tasks. It offers evidence that Andersen did not perform procedures that would have tested the risks that it identified for WorldCom, did not review significant internal WorldCom reports that tracked such critical items as capital expenditures, and did not adequately consider the need for an impairment analysis as WorldCom's financial condition deteriorated. It places particular emphasis on Andersen's failure to maintain a proper set of workpapers.

The Lead Plaintiff also emphasizes Andersen's failures to pursue and investigate what the Lead Plaintiff characterizes as red flags. "As this litigation is well beyond the pleading stage," both parties overstate the centrality of "red flags." *Ikon Office Solutions,* 277 F.3d at 668 n. 9. Allegations of GAAS and GAAP violations, coupled with allegations of red flags to which the defendants paid no mind, "can

33. In light of the controlling legal principles and the weight of Exchange Act-specific authority, Andersen's citation to *First Equity Corp. of Florida v. Standard and Poor's Corp.,* 690 F.Supp. 256, 260 (S.D.N.Y.1988), is unavailing. That case involved allegations of common law fraud against a publisher. Indeed, the author of *First Equity* recently discussed an accounting firm's scienter in connection with a Section 10(b) claim without any reference to individual employees. *See Philip Servs.,* 2004 WL 1152501, at *7–8.

be sufficient to withstand a motion to dismiss in a securities fraud action," but have little to do with the assessment of a Section 10(b) claim on a motion for summary judgment. *Id.* Nevertheless, the Lead Plaintiff's identification of red flags allegedly ignored by Andersen helps to highlight one of many reasons why Andersen's audit may be found not to have conformed with GAAS. As the AICPA explains, complying with GAAS is a fluid, context-dependent undertaking:

> As the result of performing auditing procedures or from other sources during the audit, information may come to the auditor's attention that differs significantly from the information on which the audit plan was based.... [T]he auditor may need to reevaluate the auditing procedures he or she plans to apply, based on the revised consideration of audit risk and materiality for all or certain of the account balances or classes of transactions and related assertions.

AU § 312.33. Among the types of new information acquired during an audit that would prompt a reevaluation of the audit plan are facts that may indicate wrongdoing by management. Such facts constitute "red flags" under Section 10(b). *See In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d at 672–74 (discussing law concerning red flags).

One such red flag identified by Lead Plaintiff was the discovery by Andersen personnel in the United Kingdom of a line cost accrual reversal for $33.6 million in early 2000. On October 24, 2000, an audit manager with Andersen UK sent a memorandum to Andersen's Avery and Schoppet advising them of a $33.6 million entry reversing WorldCom UK's first quarter 2001 line costs that local management believed left WorldCom UK's line costs under-accrued. Avery discussed the issue with WorldCom Controller David Myers, who advised him that the entry would be corrected. In the audit workpapers, Avery

documented his understanding of how the issue was resolved. There is no evidence that Andersen investigated how the reversal had occurred, what had contributed to the error, whether it reflected a more widespread problem, or confirmed that the error had been corrected as management represented.

One more example will illustrate the interplay between the Lead Plaintiff's proof of an alleged violation of GAAP by WorldCom and a violation of GAAS by Andersen. Until 2000, WorldCom maintained a twenty-four month reserve for anticipated line cost billing. In two stages in the year 2000, it reduced the reserve to three months. With these reductions, it materially lowered its reported line costs and improved its reported performance with respect to entries on its financial statements that were closely followed by industry experts. The release of the reserves and their effect on WorldCom's reporting of its line costs were not publicly disclosed.

The parties vigorously debate the propriety of these decisions under GAAP. They also debate the evidence that Andersen's audit of the line cost issues was deeply flawed. Andersen admits that it was aware of these releases of reserves, but has not been able to point to any documentation that it analyzed their propriety at the time. As importantly, it has not pointed to any evidence that it analyzed the significance of the release of reserves, and its implications for the reliability of WorldCom's financial reporting. Simply put, there is no evidence that it considered what WorldCom would do next to reduce the line cost expenses it reported once the reserves could be reduced no further. As we now know, the very next quarter, WorldCom began illegally to capitalize line costs.

Andersen argues that any deficiencies in its audits represent at worst negligence,

and are not evidence of recklessness. It emphasizes that the WorldCom management employees that capitalized the line costs actively concealed their fraud from fellow employees and from Andersen. Andersen describes the many tasks it did perform and the steps it took to evaluate the risk of fraud at WorldCom. Andersen argues repeatedly that the Lead Plaintiff has relied too extensively on the Restatement.

Many of the accounting issues that are implicated by this motion are analyzed in considerable detail by the parties. They recite competing passages from their source materials and expert reports. It is unnecessary for this Opinion to regurgitate their competing arguments and to set out the underlying facts for each of the issues since the Lead Plaintiff has presented sufficient evidence to require these issues to be presented to a jury.

Beyond the evidence presented on the individual accounting issues and on the many separate alleged lapses in the auditing process, the Lead Plaintiff has presented evidence that tells an overarching story. Andersen touted its Business Audit model as one that begins with the requirement that it know the business of the company it is auditing. The Lead Plaintiff has shown that Andersen understood that over the period from 1999 to 2001 WorldCom was facing increasing competitive pressure, that its strategy of growth by acquisition was stymied, that it had a history of aggressive accounting strategies to boost its reported earnings per share and to minimize its reported line costs, that by the end of 2000 it had exhausted several of those strategies, that its stock was taking a pounding, and that it would have to find or invent new avenues if it wished to continue to dampen the negative news in its financial reporting, and cushion its stock price. The Lead Plaintiff has presented evidence to support its argument that Andersen acted in willful blindness to the realities at WorldCom and in abrogation of its duty as an auditor. It has identified a host of audit failures, which would permit a jury to find that there was an egregious refusal to see the obvious, repeated failures to investigate the doubtful, and a pattern of acquiescence in improper accounting practices. There is no dispute that Andersen understood that its unqualified certification of the WorldCom financials would carry great weight with investors. This is sufficient to constitute proof of recklessness. *See AUSA Life Ins. Co.,* 206 F.3d at 221.

Andersen has framed its argument for summary judgment on a false premise: that the Lead Plaintiff must show that Andersen auditors intended to cause Andersen to issue false opinions. While proof of such an intent would constitute proof of scienter, the Lead Plaintiff may also prevail with evidence of recklessness, as that term is defined here.

Similarly, Andersen's argument that the Lead Plaintiff must show that at least a single Andersen employee acted with the requisite scienter can be swiftly rejected. As an institution that performed an audit of WorldCom through utilization of a team of auditors, the principles of collective knowledge and intent described above apply. The Lead Plaintiff is entitled to show reckless misconduct through a cumulative pattern of decisions and inaction by several Andersen auditors that encompassed a multitude of important accounting issues. WorldCom hired the firm Arthur Andersen LLP as its independent auditor, and Andersen, as a firm, was responsible for ensuring that its Business Audit model conformed to GAAS in theory and in practice. While the Lead Plaintiff may be able to show that individual Andersen employees acted with scienter with respect to individual issues, it is also enti-

tled to show that Andersen as a firm was reckless with respect to its certification of WorldCom's financial statements through the sum of its employees' activities and knowledge.

Finally, Andersen contends that no Section 10(b) liability can attach when qualified experts disagree as to whether GAAP and GAAS procedures were followed. The qualifications of Andersen's expert are not in dispute. The Lead Plaintiff notes quite accurately, however, that the report of Andersen's expert consists of a litany of the tasks Andersen performed without a meaningful analysis of whether those tasks actually fulfilled Andersen's obligation to conduct a GAAS-compliant audit. Even his rebuttal report, in which he responds to some of the critique of Andersen's audits, is noteworthy for the absence of evidence that in the period 1999 through 2002, Andersen itself investigated and analyzed significant GAAP disputes in the way that its expert does now or that GAAS demands. In any event, a jury will have to determine which expert's analysis is more compelling and reliable.[34]

Andersen's sole authority for its unusual contention that a battle of experts entitles it to summary judgment is *Danis v. USN Comm., Inc.*, 121 F.Supp.2d 1183 (N.D.Ill. 2000), which granted summary judgment to an auditor because accounting procedures "cannot be deemed reckless" where "qualified experts disagree on whether GAAP and GAAS procedures were properly followed." *Id.* at 1195. *Danis* relies upon *SEC v. Price Waterhouse*, 797 F.Supp. at 1217, for this proposition. In *Price Waterhouse*, Judge Sprizzo determined *after a trial* that there were "complex issues of accounting as to which reasonable accountants could reach different conclusions," and that the auditor-defendant's experts were "more credible, persuasive and reasonable in their analysis and conclusions" than were the SEC's team of experts. *Id.* at 1241.

Fact finding and credibility determinations are the function of the jury and are not appropriately resolved on a motion for summary judgment. *See Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. Indeed, "[w]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir.2002) (collecting cases). Within the Second Circuit, courts are "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999) (citation omitted). "Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *Id.* (citation omitted). Consequently, the submission of two competing reports, without more, nei-

---

**34.** Andersen contends that it is entitled to summary judgment because Lead Plaintiff's expert does not actually say that Andersen's audit was "reckless" or an "extreme departure" from GAAS. The expert's report is replete with examples of failures to comply with critical requirements under GAAS and opines that these "pervasive failures" existed at every stage of the auditing process. The absence of a talismanic phrase in an expert's testimony will not prevent a fact finder from concluding that Andersen's conduct was reckless. Indeed, while experts may opine on ultimate issues, they should avoid using in their testimony the very words and phrases that constitute the elements of a claim that a jury must find. *See United States v. Scop*, 846 F.2d 135, 140 (2d Cir.1988) (holding in securities fraud action that expert's use of "the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud'" constituted "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading."). *See also United States v. Jacques Dessange, Inc.*, No. S2 99 Cr. 1182(DLC), 2000 WL 294849, at *2 (S.D.N.Y. Mar. 21, 2000).

ther prohibits a jury from determining that an auditor acted recklessly, nor compels summary judgment for an auditor.[35]

### Conclusion

The motion by Andersen for partial summary judgment and for a delineation of the class period is denied. The motion by Lead Plaintiff for partial summary judgment against Andersen is granted in part.

SO ORDERED.

---

**35.** Andersen has also moved to "delineate the class period" as beginning on March 24, 2000 with respect to Andersen. March 24, 2000 is the date WorldCom filed its audited financial statements for the year ending December 31, 1999. It is undisputed that the Lead Plaintiff does not contend that Andersen is liable for any prior audit opinion.

On October 24, 2003, the class action was certified, including a class period beginning on April 29, 1999. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 275, 302 (S.D.N.Y. 2003). Andersen did not oppose this certification.

Andersen's untimely motion is denied. The issue it raises is largely pertinent to the assessment of damages and will be addressed at trial through the parties' submission of evidence and the Court's instructions to the jury.

The Lead Plaintiff's motion for partial summary judgment against Andersen based on the purported existence of false statements in WorldCom's 1999 and 2000 financial statements is granted to the extent reflected in *In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d at 697–98.